The COMMITTEE OF DOMESTIC STEEL WIRE ROPE AND SPECIALTY CABLE MANUFACTURERS, Plaintiff,

v.

UNITED STATES, Defendant,

Acindar Industria Argentina de Aceros, S.A.; Wire Rope Importers' Association of America, et al.; Grupo Industrial Camesa, S.A. de C.V., Comercial Camesa, S.A. de C.V., Aceros Camesa, S.A. de C.V., and Camesa Inc.; China National Metals and Minerals Import and Export Corporation, Defendant-intervenors.

Consol. Court No. 91–09–00685.

United States Court of
International Trade.

March 30, 1993.

Harris & Ellsworth, Herbert E. Harris II, Cheryl Ellsworth and Jeffrey S. Levin, Washington, DC, for plaintiff.

Lyn M. Schlitt, Gen. Counsel, James A. Toupin, Asst. Gen. Counsel, and Lyle B. Vander Schaaf, Office of the General Counsel, U.S. Intern. Trade Com'n, Washington, DC, for defendant.

Baker & McKenzie, Thomas Peele and Steven F. Fabry, Washington, DC, for defendant-intervenor Acindar Industria Argentina de Aceros, S.A.

Klayman & Associates, P.C., Larry Klayman, Washington, DC, for defendant-intervenor Wire Rope Importers' Ass'n of America, et al.

Shearman & Sterling, Thomas B. Wilner, Jeffrey M. Winton and Patrick Meagher, Washington, DC, for defendant-intervenor Grupo Industrial Camesa, S.A. de C.V., et al.

Graham & James, Lawrence R. Walders, Samuel X. Zhang, Jeffrey L. Snyder and Matthew E. Marquis, Washington, DC, for defendant-intervenor China Nat. Metals and Minerals Import and Export Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Committee of Domestic Steel Wire Rope and Specialty Cable Manufacturers ("The Committee"), move for judgment on the agency record challenging the final negative determinations of the United States International Trade Commission ("ITC") in *Steel Wire Rope From Argentina and Mexico,* 56 Fed.Reg. 41,565 (1991), and *Steel Wire Rope From India, the People's Republic of China, Taiwan and Thailand,* 56 Fed.Reg. 56,662 (1991).

On November 5, 1990, plaintiff filed a petition with the ITC and the United States Department of Commerce, alleging that imports of steel wire rope from Argentina, Chile, India, Israel, Mexico, the People's Republic of China, Taiwan and Thailand were being sold in the United States at less than fair value (LTFV). *See Steel Wire Rope From India, the People's Republic of China, Taiwan, and Thailand ("Steel Wire Rope I"),* U.S.I.T.C.Public 2442, Inv. Nos. 701–TA–305 and 731–TA–478, 480–482 at 4, n. 6 (1991).

Plaintiff further alleged that the domestic industry was materially injured or threatened with material injury by reason of these imports.

In its final determination, the ITC unanimously determined that the domestic industry is not materially injured or threatened with material injury by reason of imports of steel wire rope from the People's Republic of China ("China"), Taiwan, and Thailand that are sold at LTFV and imports from India that are both subsidized and sold at LTFV. *Steel Wire Rope I* at 3. Likewise, the ITC determined that the domestic industry is not materially injured or threatened with material injury by reason of imports of steel wire rope from Argentina and Mexico. *Steel Wire Rope From Argentina and Mexico ("Steel*

*Wire Rope II"),* U.S.I.T.C.Public. 2410, Inv. Nos. 731–TA–476 and 479 at 3 (1991).

Plaintiff now claims that these determinations were unsupported by substantial evidence on the record. Specifically, plaintiff claims that certain sales should not have been included in the domestic industry's total sales figures and furthermore that the ITC miscalculated the "cost of goods sold" for these sales. Plaintiff also claims that the ITC's inclusion of stainless steel wire rope within the "like product" definition was unsupported by substantial evidence on the record. Plaintiff further claims that the ITC failed to adhere to established judicial and administrative precepts in determining that the subject imports were not a cause of material injury to the domestic industry.

### DISCUSSION

In reviewing a final determination of the ITC, this Court must uphold that determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988 & Supp.1992). Substantial evidence has been defined as being "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *The Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### 1. *Material Injury*

In order to make a final affirmative determination in its injury investigation, the ITC must find that an industry in the United States: "(i) is materially injured, or (ii) is threatened with material injury, or (B) the establishment of an industry in the United States is materially retarded, by reason of imports of the merchandise...." *See* 19 U.S.C. § 1673d(b)(1)(1988).

The law sets forth several guidelines for the ITC to consider in analyzing the issue of material injury. Among the relevant factors for the ITC to consider are: (1) the volume of imports, (2) the effect of imports of that merchandise on prices in the United States for like products, and (3) the impact of such merchandise on domestic producers of like products. *See* 19 U.S.C. § 1677(7)(B) (1988).

In its final determination, which concluded that the domestic steel wire rope industry is not experiencing material injury and is not threatened with material injury, the ITC stated that:

> Net sales, gross profits, and operating income levels all increased steadily from 1988 to 1990. During this investigation period, net sales increased from $225 million to $239 million, and gross profits rose from $52.7 million to 63.4 million. This trend was also reflected in operating income, which increased markedly from $6.4 million in 1988 to $11.1 million in 1990.

*Steel Wire Rope II* at 14.

Plaintiff claims that the ITC's conclusions are based on "fundamentally inaccurate data." *See Memorandum in Support of Plaintiff's Motion For Judgment Upon the Agency Record ("Plaintiff's Brief")* at 16. During the investigatory period, two major U.S. wire rope producers ceased operation and subsequently sold many of their assets to surviving producers. First, in April 1988, assets of Union Wire Rope, a division of Armco Inc., were purchased by Wire Rope Corporation of America, Inc. ("WRCA"). Second, in June 1989, the assets of Bethlehem Steel Wire Rope Division were purchased by Williamsport Wirerope Works, Inc. ("Williamsport"). Among the assets purchased in these sales were finished goods inventory. *Plaintiff's Brief* at 16–17.

In determining whether the domestic steel wire industry was injured, the ITC included the buyer's sales of the acquired inventory in its analysis of the total net sales of WRCA and Williamsport. *Steel Wire Rope II* at 14, n. 41. The ITC stated that they included the sales of the inventory in

the net sales figure "because the original transfers of the goods were not reported as sales by the firms that were purchased, the amounts are substantial, and the inventory was valued as fair market value by independent auditors." *Id.*

Plaintiff disagrees and claims that this constituted error on the part of the ITC which was compounded by its allegedly inaccurate "cost of goods sold" calculations. Rather than attributing the actual cost of producing the acquired inventory, the ITC used as "cost of goods sold" the nominal purchase price that the respective companies paid for the inventory. *See Plaintiff's Brief* at 17–18.

■ Plaintiff's contention that these sales should not have been included in the total net sales of WRCA and Williamsport is erroneous because they represent sales made by the domestic industry. However, plaintiff's argument that the ITC erroneously calculated "cost of goods sold" has merit. If the companies purchased the inventory at a nominal price far below the actual cost of goods sold, then this could artificially inflate the profits of the industry. Based on the evidence on the record, however, any marginal error on the part of the ITC would not have made a difference in their determination. The ITC determined during its investigation that sales increased, as did gross profits and operating income. Therefore, the ITC acted reasonably in determining that there was no injury caused to the domestic industry.

### 2. *Causal Link Between Imports and Industry*

Plaintiff also claims the ITC failed to adhere to established judicial and administrative precepts in determining that the subject imports were not a cause of material injury to the domestic industry. *Plaintiff's Brief* at 35.

In the investigation the ITC concluded that "[a]fter considering the record in these investigations, we find no causal link between the condition of the industry and the cumulated subject imports." *Steel Wire Rope II* at 16. The ITC predicated their conclusion on three factors. First, that the cumulated market share of the subject imports was relatively small. Second, that the ITC found no "causal relationship between the pattern of increases and decreases in the subject imports and the performance of the domestic industry." *Id.* Third, they claim to have found "no evidence of adverse price effects by the cumulated subject imports." *Id.* at 17.

Plaintiff claims that the ITC's determination based on these factors was unsupported by substantial evidence and not in accordance with law.

Plaintiff states that the ITC failed to assess the significance of the levels of imports subject to the investigation. According to 19 U.S.C. § 1677(7)(C)(i) (1988 & Supp.1992), the ITC should "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."

In the case at hand, imports of steel wire rope from the countries subject to the investigation increased from 15,100 tons in 1988 to 21,903 tons in 1989, and decreased to 18,734 tons in 1990. *Steel Wire Rope II* at A–83. These imports accounted for 7.6%, 10.8% and 9.8% of the apparent domestic consumption of steel wire rope from 1988 to 1990. *Id.* at A–84.

Plaintiff claims that the imports were a substantial percentage of the domestic consumption. Nevertheless, "for one industry, an apparently small volume of imports may have a significant impact on the market; for another the same volume might not be significant." H.R.Rep. 317, 96th Cong., 1st Sess. 46 (1979). Furthermore, "it is the *significance* of a quantity of imports, and not absolute volume alone, that must guide ITC's analysis under section 1677(7)." *USX Corp. v. United States*, 11 CIT 82, 85, 655 F.Supp. 487, 490 (1987); *Atlantic Sugar, Ltd. v. United States*, 2 CIT 18, 23, 519 F.Supp. 916, 921–22 (1981) (emphasis in original).

■ The statute does not mandate the exclusive examination of a certain factor like volume. The criteria set forth in section 1677 are merely guidelines to be evaluated in light of other factors and the industry as a whole. In fact, this court has stated that

"[u]nder the 'substantial evidence' standard of review, the court must determine whether ITC's conclusions are supported by the evidence on the record *as a whole.*" *USX Corp.*, 11 CIT at 84, 655 F.Supp. at 489 (emphasis in original).

■ In this case, the volume of subject imports may have increased from 1988 to 1990, but so did the net sales, gross profits and operating income of the domestic industry. Also noteworthy is the fact that the volume of imported steel wire rope decreased by over 2,000 tons from 1989 to 1990. Therefore, in light of all the evidence on the record, it is apparent that the volume of imports did not harm the domestic industry.

Plaintiff further claims that the ITC erred in not finding a causal link between the imports and any material injury to the domestic steel wire rope industry. It is well-settled that if the ITC is unable to find a causal link between material injury and the imports, then it must deny relief to the domestic industry. *Gifford–Hill Cement Co. v. United States*, 9 CIT 357, 359, 615 F.Supp. 577, 579 (1985).

In the case at hand, the ITC determined that the "cumulated market share of the subject imports is relatively small and has been so throughout the period of investigation." *Steel Wire Rope II* at 16. Furthermore, the ITC determined that "[d]uring the three year investigatory period, both the domestic industry and the subject imports gained market share, at the expense of Korean imports, which are not subject to a title VII investigation, and are therefore considered to be fairly traded." *Id.* at 16–17. Thus, plaintiff's complaint, that the ITC failed to consider possible causes of material injury to the domestic industry, is unfounded.

Finally, plaintiff claims that the ITC's determination concerning price effects of the subject imports was unsupported by substantial evidence on the record.

In its determination, the ITC stated that "[n]otwithstanding evidence of some underselling by the imports, prices of the domestic products generally increased during the period of investigation. This is especially so in the case of bright wire rope, which accounts

for the bulk of U.S. production and shipments, by both quantity and value." *Id.* at 17, A–51.

Thus, even with an increase in price, the domestic sales still increased. Therefore, in this respect, this Court finds that the ITC acted reasonably and in accordance with law.

### 3. *Threat of Material Injury*

■ In its determination, the ITC also stated that the domestic industry is not threatened with material injury by reason of the subject imports. *Steel Wire Rope I* at 14–18; *Steel Wire Rope II* at 20–23. Plaintiff, however, claims that this is also unsupported by substantial evidence on the record and not in accordance with law. *Plaintiff's Brief* at 52–57.

In determining whether an industry in the United States is threatened with material injury, the ITC shall consider several economic factors including: (1) an increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports, (2) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level, (3) the probability that imports will enter the United States at prices that will have a depressing or suppressing effect on the domestic prices, (4) any substantial increase in inventories of merchandise in the United States, and (5) the presence of underutilized capacity for producing the merchandise in the exporting country. *See* 19 U.S.C. § 1677(7)(F)(i) (Supp.1992); *see also Steel Wire Rope II* at 18–19.

The ITC evaluated these factors during its investigation and concluded that there was no threat of material injury. As previously stated, the market share of the subject imports was relatively low for the period of investigation. *Steel Wire Rope II* at 20. Furthermore, there was no rapid increase in penetration of the subject imports as "[b]oth the volume and market share of subject imports decreased from 1989 to 1990 and decreased substantially for the first six months of 1991 as compared to the first six months of 1990." *Id.*

Moreover, although there is evidence of underselling, there is nothing in the record indicating that subject imports will have a suppressing or depressing effect on U.S. prices. In fact, prices of domestic products generally increased during this period. *Id.* at 21.

Thus, the ITC's determination that the domestic industry is not threatened with material injury was in accordance with law and is hereby affirmed.

### 4. *Stainless Steel Wire Rope*

■ Plaintiff also claims that the ITC's inclusion of stainless steel wire rope within the "like product" definition was unsupported by substantial evidence on the record. In its final determination, the Commission defined the like product as "all steel wire rope, regardless of composition or end use." *Steel Wire Rope II* at 11.

Pursuant to 19 U.S.C. § 1677(10) (1988 & Supp.1992), a "like product" is defined as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle."

Generally, the ITC will consider several characteristics in determining what constitutes a "like product." For example, the ITC will consider (1) physical appearance, (2) interchangeability, (3) channels of distribution, (4) customer and producer perceptions, (5) common manufacturing facilities and production employees, and (6) price. *See Torrington Co. v. United States,* 14 CIT 648, 652, 747 F.Supp. 744, 749 (1990), *aff'd,* 938 F.2d 1278 (Fed.Cir.1991); *see also Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 636–40, 693 F.Supp. 1165, 1167–71 (1988).

With these factors in mind, questionnaire responses from domestic producers confirmed the similarity of production processes, equipment, and employees used in the manufacture of stainless and carbon rope. *See Steel Wire Rope II* at A–25–26.

Plaintiff urges this Court to distinguish stainless rope from carbon rope on the grounds that stainless rope is corrosion-resistant and is used in applications requiring resistance to corroding agents. *Plaintiff's Brief* at 33.

The ITC discussed the similarities as well as any differences between the two types of rope and concluded that they are "like products." For example, although stainless rope is corrosion resistant, various types of carbon rope are also corrosion resistant. Furthermore, carbon and stainless steel rope generally are produced at the same facilities, using the same equipment, processes and employees, are relatively interchangeable and have similar channels of distribution. *See Steel Wire Rope II* at 8–11; *see also, Steel Wire Rope I* at 4–5.

Therefore, this Court finds that the ITC acted reasonably in classifying the two types of rope as "like products," and hereby affirms the determination of the ITC as to this issue.

## CONCLUSION

In accordance with the foregoing opinion, plaintiff's motion is denied. The ITC's conclusion that the domestic steel wire rope industry was not injured or threatened with material injury was reasonable and in accordance with law. Therefore, its determination is affirmed in all respects and this case is dismissed.

## JUDGMENT

This case having been submitted for decision, and the Court, after due deliberation and having rendered a decision herein,

IT IS HEREBY ORDERED that plaintiff's motion for judgment on the agency record is denied as the International Trade Commission's conclusion, that the domestic steel wire rope industry was not injured or threatened with material injury, is affirmed in all respects, and it is further

ORDERED that this case is hereby dismissed.