The TIMKEN COMPANY and Republic Engineered Steels, Inc., Plaintiffs,

v.

UNITED STATES, Defendant,

and

Aços Villares, S.A.; Aço Minas Gerais, S.A.; Co–Steel Raritan, Defendant–Intervenors.

Slip Op. 96–8.
Court No. 93–08–00475.

United States Court of International Trade.

Jan. 3, 1996.

---

Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert De Prest and Myron A. Brilliant), Washington, DC, for plaintiffs.

Lyn M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, United States International Trade Commission, (Scott D. Andersen), Washington, DC, for defendant.

Willkie Farr & Gallagher (William H. Barringer, Daniel L. Porter and Nancy A. Fischer) Washington, DC, for Aço Villares, S.A., defendant-intervenor.

Baker & McKenzie (Thomas Peele), Washington, DC, for Aço Minas Gerais, S.A., defendant-intervenor.

Jeffrey W. Carr, Philadelphia, PA, for Co–Steel Raritan, defendant-intervenor.

## OPINION

TSOUCALAS, Judge:

This action is before the Court on a motion for judgment upon the administrative record pursuant to Rule 56.2 of this Court. The Timken Company and Republic Engineered Steels Inc. (collectively "plaintiffs") were the petitioners in the underlying investigation and are United States producers of the like product at issue. Plaintiffs challenge the unanimous negative final determination of the United States International Trade Commission ("Commission" or "ITC"), that the United States industry producing other special quality carbon and alloy hot-rolled bars and cut-length rods is neither materially injured nor threatened with material injury by reason of imports of these products from

Brazil that have been found by the U.S. Department of Commerce, International Trade Administration ("Commerce"), to be sold in the United States at less than fair value ("LTFV"). The views of the Commission are published in *Certain Special Quality Carbon and Alloy Hot–Rolled Steel Bars and Rods and Semifinished Products From Brazil* ("*Final Determination*"), USITC Pub. 2662, Inv. No. 731–TA–572 (July 1993), 58 Fed.Reg. 38,138 (USITC 1993).[1]

### Background

On June 9, 1992, plaintiffs filed petitions with the Commission and Commerce alleging that an industry in the United States was materially injured and threatened with material injury, by reason of LTFV imports of certain special quality carbon and alloy hot rolled products from Brazil.[2] *Final Determination* at I–3–4.

Effective June 9, 1992, the Commission commenced a preliminary investigation to determine whether there is a reasonable indication that an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded by reason of imports of such merchandise into the United States. *Certain Special Quality Carbon and Alloy Hot–Rolled Steel Bars and Rods and Semifinished Products Thereof From Brazil,* 57 Fed. Reg. 27,064 (USITC 1992). On July 21, 1992, the Commission made an affirmative preliminary injury determination. *Certain Special Quality Hot–Rolled and Semifinished Carbon and Alloy Steel Products From Brazil* (*ITC Preliminary Determination*"), USITC Pub. 2537 at 2, Inv. No. 731–TA–572 (July 1992), 57 Fed.Reg. 33,735 (USITC 1992) (prelim.).

Effective January 11, 1993, the Commission instituted a final investigation to determine whether an industry in the United States is materially injured, or is threatened with material injury, or the establishment of an industry in the United States is materially retarded, by reason of the subject Brazilian imports. *Certain Special Quality Carbon and Alloy Hot–Rolled Steel Bars and Semi-*

1. At the time of issuance of this determination, the Commission was comprised of Chairman Newquist, Vice–Chairman Watson and Commissioners Rohr, Brunsdale, Crawford and Nuzum.

2. On June 29, 1992, Commerce initiated an investigation to determine whether imports of certain alloy and carbon hot-rolled bars, rods, and semifinished products of special bar quality ("SBQ") engineered steel from Brazil are being, or are likely to be, sold in the United States at LTFV. Provisionally, Commerce accepted petitioners' claim that the subject merchandise comprised a single "class or kind" of merchandise. *Initiation of Antidumping Duty Investigation: Certain Alloy and Carbon Hot Rolled Bars, Rods and Semifinished Products of Special Bar Quality Engineered Steel From Brazil,* 57 Fed.Reg. 29,703 (Dep't of Comm.1992).

On August 12, 1992, in a decision memorandum, Commerce determined that the subject merchandise constitutes two distinct classes or kinds of merchandise: (1) alloy and carbon hot-rolled bars and rods of SBQ engineered steel, and (2) semifinished products of SBQ engineered steel. *Preliminary Determination of Sales at Less Than Fair Value: Certain Alloy and Carbon Hot–Rolled Bars, Rods, and Semifinished Products of Special Bar Quality Engineered Steel From Brazil* ("*LTFV Preliminary Determination*"), 58 Fed. Reg. 3,533, 3,535 (Dep't Comm.1993). Commerce's decision was based on the following product differences: physical characteristics, ultimate use, ultimate purchaser expectations, channels of trade, and methods of advertising. *LTFV Preliminary Determination,* 58 Fed.Reg. at 3,535.

The investigated "special quality" steel products consist of two categories: (1) *semifinished* ingots, blooms and billets; and (2) *finished* "hot-rolled" bars and rods. *Final Determination* at 7. The "semifinished" products include products resulting from both conventional ingot teaming and continuous casting. *Id.* at 7–8. These semifinished products, generally, are of much greater diameter than finished hot-rolled bars or rods and have not been further worked beyond initial hot-rolling. *Id.* at 8. Typically, they are characterized by a rough surface and do not meet the dimensional tolerances for bar products. *Id.* Hot-rolled bars and rods are subjected to intense heat during a manufacturing process which involves passing semifinished billets through a series of rolls. Hot-rolled "bars" are hot-rolled products, in cut-lengths and irregularly wound coils, either round, rectangular, or hexagonal in shape and have diameters from ½ to 12 inches, with the upper limit for coiled bars being 2 inches. The subject imports include cut-length hot-rolled bars but exclude coiled hot-rolled bars. Hot-rolled "rods" are usually coiled, hot-rolled products of a solid, approximately round cross section, not under 0.20 inches nor over 0.74 inches in diameter. The subject imports include cut-length rods, but not coiled rods. *Id.* at 8–9.

*finished Products From Brazil,* 58 Fed.Reg. 6,976 (USITC 1993).

The Commission made a final determination as to injury on July 2, 1993. *Final Determination* at 3, I–3. Significantly, the Commission concluded that the four industries in the United States consisting of the domestic producers of the like products: (1) free-machining semifinished steel; (2) other special quality carbon and alloy semifinished steels; (3) free-machining hot-rolled bars and cut-length rods; and (4) other special quality carbon and alloy hot-rolled bars and cut-length rods[3] ("OSBQ bars") were ·neither materially injured nor threatened with material injury by reason of LTFV imports from Brazil of special quality carbon and alloy semi-finished steel and hot-rolled carbon and alloy bars and cut-length rods.[4] *Final Determination* at 5, 10, 32–58.

It is the Commission's determination pertaining to the fourth industry, *i.e.,* the "other special quality bar" industry, that is the subject of this action. *Memorandum of Plaintiffs Republic Engineered Steels Inc. and The Timken Company in Support of Their Motion for Judgment Upon the Agency Record ("Plaintiffs' Brief")* at 6. Plaintiffs advance several challenges to the Commission's negative injury and threat determination. The ITC and defendant-intervenors, Aços Villares, S.A., Aço Minas Gerais, S.A.[5] and Co–Steel Raritan, oppose plaintiffs' motion.

### Standard of Review

The Court must uphold the Commission's determination unless it finds that the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C.

3. Due to the Commission's finding in its preliminary investigation that hot-rolled cut-length and coiled bars and hot-rolled cut-length rods comprise one like product, these products combined are referred to as "hot-rolled bars." *Final Determination* at I–11 n. 20.

4. Material retardation of a domestic industry by reason of the subject imports was not an issue in the Commission's investigation. *Id.* at 5 n. 1.

5. Aço Minas is a Brazilian producer of semifinished steel product. At oral argument, The Timken Company conceded that its appeal of the ITC determination at issue does not concern

§ 1516a(b)(1)(B) (1988). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988), *aff'd,* 894 F.2d 385 (Fed.Cir.1990).

### Discussion

#### 1. Like Product [6]

In the case at bar, five out of six Commissioners initially found two "like" products consisting of (1) semifinished special quality carbon and alloy steels and (2) hot-rolled special quality carbon and alloy bar (including cut-length and coiled bar) and cut-length rod.[7] *ITC Preliminary Determination* at 9. In the final determination, the Commissioners affirmed their preliminary finding that there are separate like products of semifinished steels and hot-rolled bars and cut-length rods. *Final Determination* at 12. Thus, the Commission determined that there are four "like" products. *Id.* at 17.

Avoiding a frontal attack, plaintiffs dispute the ITC's "like product" finding on the ground that the Commission impermissibly treated hot-rolled finished bar and cut-length rod and semifinished special quality steel as separate like products. *Plaintiffs' Brief* at

semifinished product. *Transcript ("Tr.") of Oral Argument* at 46.

6. The administrative record is cited as "P.R." and "C.R." referring to the public and confidential records, respectively.

7. Commissioner Rohr found four like products consisting of: semifinished free-machining steel; all other semifinished special quality steel; finished free machining steel bars; and all other finished special quality steel bar. *Final Determination* at 9, (Separate Views of Commissioner David B. Rohr) 37.

51–55. Plaintiffs claim that the "Commission's sole task ... is to determine whether there exist separate *industries*." *Id.* at 54 (citing *Algoma Steel Corp. v. United States*, 12 CIT 518, 522–23, 688 F.Supp. 639, 644 (1988), *aff'd*, 865 F.2d 240, *cert. denied*, 492 U.S. 919, 109 S.Ct. 3244, 106 L.Ed.2d 590 (1989)). According to plaintiffs, "[a]ny differences between the potential 'like products' are instructive *only* if and when there arise difficulties addressing the fundamental question: whether separate industries existed." *Plaintiffs' Brief* at 54. Plaintiffs' support is the claim that the continuous process of production by which semi-finished steel is made into bar products contradicts the Commission's finding that semifinished and hot-rolled products are separate products. *Tr. of Oral Argument* at 20. Plaintiffs also charge that the Commission distorted its causation analysis by double-counting certain in-process semifinished special quality products as finished products, *i.e.*, counting them as both semifinished and finished. *Plaintiffs' Brief* at 2, 51–56. In addition, plaintiffs allege that the Commission improperly relied on data pertaining to 1992 rather than 1990 and 1991 data. *Id.* at 29–30.

■ The statute frames the definition of an industry in terms of like product. *See U.S. Steel Group v. United States*, 18 CIT ——, ——, 873 F.Supp. 673, 682 (1994). Thus, in determining whether an industry in the United States is materially injured or threatened with material injury by reason of the subject imports, the Commission must first define the "like product" in order to determine the relevant "industry." *See* 19 U.S.C. § 1677(4)(A) (1988). Therefore, the Court rejects plaintiffs' claim that the industry should be defined without reference to "like product." Nor does *Algoma Steel*, 12 CIT at 518, 688 F.Supp. at 639, support plaintiffs' proposition. That case stands for a point not in dispute in this case. *See Algoma*, 12 CIT at 522–23, 688 F.Supp. at 644 (ITC accepts Commerce's determination of which merchandise is in the class of merchandise sold at LTFV and, in turn, determines which domestic industry produces products like the ones in the class defined by ITA and whether that industry is injured by the relevant imports).

The statute defines "like product" as "a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation." 19 U.S.C. § 1677(10). In defining the "like product," the Commission typically considers (1) physical characteristics and uses, (2) interchangeability of the products, (3) channels of distribution, (4) customer and producer perceptions of the products, (5) the use of common manufacturing facilities and personnel, and (6) price. *Aramide Maatschappij V.O.F. v. United States*, 19 CIT ——, ——, Slip Op. 95–113 at 4, 1995 WL 379857 (June 19, 1995). *See also Calabrian Corp. v. United States*, 16 CIT 342, 346 n. 4, 794 F.Supp. 377, 382 n. 4 (1992); *Torrington Co. v. United States*, 14 CIT 648, 652, 747 F.Supp. 744, 749 (1990), *aff'd* 938 F.2d 1278 (1991).

Further, the Commission examines five factors to determine whether a semifinished product is a like product, distinct from the finished product. These factors include: (1) the necessity and costs of further processing for the semifinished product; (2) the degree of interchangeability between the semifinished and finished products; (3) the extent to which the use of the semifinished product is dedicated to the finished product; (4) whether the two products have independent markets and uses; and (5) whether the semifinished product imparts an essential characteristic or function to the finished product. *U.S. Steel Group*, 18 CIT at ——, n. 3, 873 F.Supp. at 682 n. 3 (citation omitted).

■ Preliminarily, the Court notes that the "bases upon which a like product determination is made 'fall[ ] within the Commission's broad discretion and expertise in conducting investigations.'" *Aramide Maatschappij*, 19 CIT at ——, Slip Op. 95–113 at 4 (quoting *Chung Ling Co. v. United States*, 16 CIT 636, 647, 805 F.Supp. 45, 54 (1992)). *See also Asociacion Colombiana de Exportadores de Flores v. United States*, 12 CIT 634, 638, 693 F.Supp. 1165, 1169 (1988).

Turning to the Commission's examination of factors, the Court notes that the Commission's investigation revealed relatively significant processing costs associated with trans-

forming the special quality semifinished product into hot-rolled bars or rods. *Final Determination* at 12. Also, significant value was found to be added to the semifinished product in producing finished wire rods, including costs for reheating, rolling and coiling the billets. *Id.* at 14. Significantly, the Commission found that the essential characteristics of special quality semifinished steel and hot-rolled special quality bars differed. *Id.* at 12. Further, the two products are not interchangeable; semifinished products require further processing. For example, "[B]illets sold for rerolling have a rough finish only and are not produced to the same size and straightness tolerances. Moreover, they are not sold for end-use applications, but instead are an intermediate product, intended to be reheated and rerolled into smaller cross-section products." *Petitioners' Prehearing Brief,* P.R. Document No. 170, Exhibit P-1 at 2, ¶ 6. Further, industry standard tolerances for hot-rolled bars are considerably more exacting than for special quality semifinished products. *Final Determination* at 13–14. In addition, "there is a significant independent market for special quality semifinished steel products" and "a significant quantity of semifinished special quality steel is used in the manufacture of products that are not included or specifically excluded from the scope of this investigation." *Id.* at 12–13.

Moreover, plaintiffs themselves admit that "[t]here are undeniably a number of differences between finished bars and semifinished product." *Plaintiffs' Brief* at 54. Plaintiffs also stated: "[T]rue semifinished [is] a product with a rough surface and lacking dimensional tolerances which is sold to other steel mills for rerolling, as contrasted with the finished, smooth-surfaced, dimensional-tolerant products which are sold directly in large cross-sections to the forging, cold-forming, and other machining industries." *Hearing Tr.,* P.R. Document No. 186 at 53. *See also* Plaintiffs' Letter to Lynn Featherstone, Director, Office of Investigation, ITC, November 27, 1992, at 5–7 proposing revisions to the product definition (Semifinished products possess rougher surface and less exact dimensional tolerances than are specified for bar product and are produced and sold to the trade for rerolling while special quality products produced on a primary mill or by reason of rerolling on a bar mill have the smooth surface and dimensional tolerances specified for bar products and are suitable for sale to end users.). *See Appendix to Memorandum of Plaintiffs Republic Engineered Steels Inc. and The Timken Company in Support of Their Motion for Judgment Upon the Agency Record,* Exhibit 4 (A.R. 1–111). *See also* P.R. Document No. 111.

As plaintiffs themselves note, "semi-finished products . . . come off the . . . mill and . . . are sold in a semi-finished condition" to the trade. *Tr. of Oral Argument* at 21. While there is evidence that, for many OSBQ bars, the manufacturing process is a continuum, some semifinished steel not consumed internally is sold by U.S. producers in an independent market. *Final Determination* at 12–13, 14. The record demonstrates that a significant quantity of semifinished products are used to produce products other than bars (*e.g.,* hot-rolled rod, not subject to this investigation). *See* C.R. Document No. 19 at 3–7, 9–10. The Commission concluded that, although the non-captive market for special quality semifinished steel decreased from 15% of domestic production to 6% since the preliminary determination, 6% represents "a very large amount of absolute tonnage of a significant value." [8] *Final Determination* at 13.

In addition, the Court disagrees that the Commission double-counted certain product. As Aço Minas Gerais, S.A., correctly observes, double-counting "would occur if the Commission counted the same product twice in tabulating data for one industry, thereby wrongly doubling the size of the industry." *Memorandum of Defendant–Intervenor Aço Minas Gerais, S.A. in Opposition to Plaintiffs' Motion for Judgment Upon the Agency Record* at 17. While some semifinished product is subsequently processed into hot-rolled bars, the record establishes that domestic OSBQ bars shipment data analyzed

---

8. Commissioners Brunsdale and Crawford did not believe that the absolute dollar amount of the independent market was relevant to the like product determination. *Id.* at 13 n. 29.

by the Commission pertained solely to OSBQ bars, not semifinished OSBQ products. *See* C.R. Document No. 36, Tables F–2, F–5.

■ Hence, taken as a whole, the Commission's like product determination is reasonable, supported by substantial evidence in the record and is in accordance with law. *See Fresh Garlic From the People's Republic of China*, USITC Pub. 2825, Inv. No. 731–TA–683 (Nov.1994) (final) (demonstrating the Commission's finding of several separate like products, in spite of inclusion of captive transfers, based upon differences in end use, lack of interchangeability of production facilities and production processes, and producers' and consumers' differing perceptions of each product group).

2. *Industry*

Plaintiffs further assert that the Commission's injury determination is predicated upon a definition of the domestic "industry" that is erroneous. Plaintiffs submit that the Commission should have restricted the scope of the industry to so-called "Class 1" producers of "special quality bar" instead of including in its measurement of domestic industry data, a number of companies which plaintiffs characterize as "Class 2" and "Class 3" producers mainly of "merchant quality bar," not the high quality larger cross-section special quality products like the imported LTFV product.[9] *Id.* at 2, 33–35, 39–45. For example, plaintiffs contend that the Commission should have excluded minimills from its analysis as the capability of minimills is not on par with that of Class 1 producers because the minimills cannot produce steel of the same size, ratio and cross section, or offer the trade all types of special quality bar. *Tr. of Oral Argument* at 19–20. Plaintiffs maintain that the Commission's inclusion of Class 2 and 3 companies within the scope of the industry distorted the Commission's causation analysis. *Plaintiffs' Brief* at 2.

Plaintiffs present an argument that is without merit. In its final determination, the Commission aptly responded to plaintiffs' argument stating:

Counsel for petitioners admitted that petitioners' so-called "classes" are not referenced in Commerce's scope, not mentioned in the petition, not part of any published industry standards, not the basis for any marketing of special quality products even by so-called Class 1 producers, and are not a term of art. Petitioners admitted that so-called Class 2 and Class 3 producers manufacture special quality bars and that there is an "overlap of competition" between the three classes. Moreover, the record indicates that at least one so-called Class 1 producer purchased special quality bars from so-called Class 2 and Class 3 producers.

*Final Determination* at 16. In addition, the domestic industry confirmed that plaintiffs' "class system" is not reflective of terminology their companies use or distinctions they make. *See Hearing Tr.*, P.R. Document No. 186 at 159, 165–66.

Plaintiffs' argument that the Commission should have limited its definition of the domestic industry producing the like products to only part of the domestic industry (in this case, Class 1 producers) has been rejected by the court on several occasions. *Copperweld Corp. v. United States*, 12 CIT 148, 165–66, 682 F.Supp. 552, 569 (1988); *National Ass'n of Mirror Mfrs. v. United States*, 12 CIT 771, 778, 696 F.Supp. 642, 647–48 (1988).

In general, the term "industry" is defined by the statute as "the domestic producers *as a whole* of a like product, or those producers whose collective output of the like product constitutes a major proportion of the total domestic production of that product." 19 U.S.C. § 1677(4)(A) (emphasis added). Thus, on its face, the statute instructs the Commission to examine the domestic producers, as a whole, of the like product and to assess the effects of dumped imports in relation to the United States production of the like product. *See id.* § 1677(4)(A), (D).

---

9. According to plaintiffs, there are three levels or classes of special quality bar producers. Plaintiffs define Class 1 producers as those producers (primarily non-minimills) who produce higher quality SBQ steels in sizes larger than 3.13 inches in diameter that consistently meet exacting standards. According to plaintiffs, minimills fall within the Class 2 and Class 3 categories. *Id.* at 15; *see also Petitioners' Prehearing Brief*, P.R. Document No. 170 at 32–41.

■ 587

In this case, Commerce's scope product encompassed *all* special quality bar and cut-length rod products in sizes above and below the size limits asserted to characterize so-called Class 1 products. *See Final Determination* at 16. Further, the Commission found that special quality bars in a similar wide range of sizes are produced by special quality producers, including Class 2 and Class 3 producers. *Id.* Plaintiffs do not dispute that all producers in its proffered three class system produce the subject OSBQ bars. A narrow definition, *i.e.*, one excluding captive production, would not encompass all domestically produced products "like" the investigated products. *See U.S. Steel Group*, 18 CIT at ———————, 873 F.Supp. at 681–82 (affirming the Commission's inclusion of captive production of hot-rolled product in assessment of the hot-rolled industry, even that used in cold-rolled, corrosion-resistant and plate products). *See also Electrolytic Manganese Dioxide From Greece and Japan*, USITC Pub. 2177 at 9, Inv. Nos. 731–TA–406 and 408 (April 1989) (final) (in cases dealing with captive markets, ITC includes all domestic production of the like product, whether consumed captively or in the open market, within the domestic industry); *Thermostatically Controlled Appliance Plugs and Internal Probe Thermostats From Canada, Japan, Malaysia and Taiwan*, USITC Pub. 2152 at 8, Inv. Nos. 701–TA–292, 731–400 and 402–404 (Jan.1989) (final) (there is no statutory basis for excluding captive production from the definition of industry).

Plaintiffs also ignore the fact that, in including captive production, the Commission recognized that the investigated imports may have different effects on captive and open-market production. *Final Determination* at 22. The Commission viewed "the issue of captive consumption as a condition of competition relevant for assessing the condition of the domestic industries and for assessing causation issues." *Id.*

■ In sum, the Court finds that the Commission correctly rejected plaintiffs' proposed scope of the industry which excluded special quality products of sizes below 3.13 inches. The Court affirms the industry determination as supported by substantial evidence and in accordance with law.

### 3. Present Material Injury

The Commission made a negative injury determination regarding the Brazilian imports at issue. Plaintiffs aver that the Commission's analysis was flawed because the Commission weighed affirmative evidence of injury by LTFV imports against evidence of other possible contributing factors. *Plaintiffs' Brief* at 24–38. According to plaintiffs, the Commission impermissibly relied on insubstantial and anecdotal information concerning alternative causes of injury and discounted evidence of underselling by Brazilian imports which resulted in significant lost sales volume, price depression, lost revenue and depressed profits. *Id.* at 26–37; *Complaint* at 3. In particular, plaintiffs protest the Commission's consideration of factors such as entry into the domestic market of so-called "minimills" and changes in the product specifications by major domestic purchasers. *Plaintiffs' Brief* at 30–38; *Tr. of Oral Argument* at 11–14. The crux of plaintiffs' argument is that the domestic industry lost profits in 1991 while minimills only entered the market in 1992. *Tr. of Oral Argument* at 4, 12. Plaintiffs also argue that the role of price premiums by domestic producers was cancelled out by the fact that domestic producers reduced their prices and hence lost revenue to prevent volume losses. *Plaintiffs' Brief* at 27 n*. In addition, plaintiffs suggest that the only relevant products at issue are so-called "bellwether" OSBQ bar products and that the Commission had unusually complete pricing information on these special quality products.[10] *Id.* at 26–28. Finally,

10. Because this investigation covered a very wide range of products and the Commission experienced difficulty in collecting adequate price data in the preliminary investigation, the petitioners and the respondents were consulted extensively in selecting products for the purpose of obtaining prices on items that are commonly sold by both producers and exporters. The seven selected products included several selected by each. For each of these products, producers and importers were asked to provide f.o.b. ("Free on Board") and delivered prices for their largest sales in each quarter, as well as total quantities and values shipped, in all quarters during Janu-

plaintiffs argue that the Commission's determination improperly relied on data pertaining to 1992 rather than 1990 and 1991 data. *Id.* at 29–30.

The Commission is directed to make final determinations of whether an industry in the United States is materially injured or threatened with material injury. 19 U.S.C. § 1673d(b)(1)(A) (1988). Congress has defined "material injury" as "harm which is not inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). *See also* S.Rep. No. 1298, 93d Cong., 2d Sess. 180 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7317 (injury must be a harm which is more than frivolous, inconsequential, insignificant, or immaterial). The Commission is required to assess the effects of subsidized or dumped imports in relation to the United States production of the like product within that industry. 19 U.S.C. § 1677(4)(D). To determine whether the domestic industry is materially injured by reason of the investigated LTFV imports, the Commission is required to evaluate the volume of imports, their effect on domestic prices for the like products, the impact on domestic producers of like products, and other relevant economic factors. 19 U.S.C. § 1677(7)(B). In analyzing the volume of imports, the Commission

> shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

19 U.S.C. § 1677(7)(C)(i). The Commission evaluates the price effects of the investigated imports on the domestic industry by considering whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of like products of the United States, and

> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price in-

creases, which otherwise would have occurred, to a significant degree.

*Id.* § 1677(7)(C)(ii).

### A. *Volume of LTFV Imports*

The Commission determined that volume and value of imports of other special quality carbon and alloy steel hot-rolled bar imports from Brazil, as a percentage of apparent domestic consumption, were low throughout the period of investigation ("POI"). *Final Determination* at 42. The absolute volume of the subject imports declined over the POI. *Id.* Brazilian market share decreased between 1991 and 1992. *See* C.R. Document No. 36, Table F–5. Tonnage of OSBQ product from Brazil fell between 1991 and 1992. *Id.* By contrast, during that period, U.S. domestic shipments increased by 3% from 3.995 million to 4.115 million tons. *Id.* The Commission noted that domestic producers retained over 95% of the market share over the POI. Total apparent consumption decreased from 96.9% in 1990 to 95.6% in 1991 and then increased to 95.8% in 1992.[11] *Id.* at 42, I–41. Although Brazilian OSBQ bar imports increased between 1990 and 1991, they declined in 1992 to approximately the same level as at the beginning of the investigation. *Id.* at 42. Apparent domestic consumption of the subject imports fell by 1.9% percentage points between 1990 and 1992, decreasing by 4.6%—from 4.4 million tons in 1990 to 4.2 million tons in 1991, and then increased by 2.8% percentage points to 4.3 million tons during 1992. *Id.* at I–41.

On the basis of this data indicating a small and declining volume, the Commission reasonably determined that "LTFV imports of other special quality bars were not significant and had no significant volume effect on the domestic industry throughout the period of investigation." *Id.* at 42, 47.

In addition, although plaintiffs argue that the Commission abused its discretion in relying on 1992 data, use of data from the last year of the POI has been approved by this Court. *See, e.g., Committee of Domestic*

---

ary 1990–December 1992. Customers were asked to provide similar data for their purchases of these products. *Final Determination* at I–86.

11. The Court notes, parenthetically, that measurable market share data is not anecdotal. *See* C.R. Document No. 36, Table F–5.

*Steel Wire Rope & Specialty Cable Mfrs. v. United States,* 17 CIT 233, 237, 818 F.Supp. 376, 380 (1993). The United States Court of Appeals for the Federal Circuit has also held that material injury is to be determined as of the time that the Commission makes its determination. *See Chaparral Steel Co. v. United States,* 901 F.2d 1097, 1104–05 (Fed. Cir.1990). Thus, in the case at bar, the 1992 period is material to the Commission's July 2, 1993 determination. Furthermore, although the Commission noted that distortions of data resulting from the filing of a petition sometimes occur, it did not believe such distortions existed in the data used in this investigation. *Final Determination* at 35 n. 142. Plaintiffs have submitted no evidence to demonstrate that actual distortion existed in the 1992 data relied upon by the Commission. The Commission also did not ignore 1990–1991 data; it found insignificant volume effects "throughout the period of investigation." *Id.* at 42.

■ This court has affirmed the Commission's negative determinations that volume of imports did not harm the domestic industry where the volume of foreign imports increased together with net sales and/or apparent consumption of the domestic industry. *See, e.g., Committee of Domestic Steel Wire Rope,* 17 CIT at 237, 818 F.Supp. at 380; *USX Corp. v. United States,* 12 CIT 844, 848–49, 698 F.Supp. 234, 238–39 (1988) (import volumes approximately 1%, import penetration levels stable, apparent domestic consumption increased). Thus, the Court finds the Commission's determination concerning the significance of OSBQ bars from Brazil to be reasonable. Moreover, plaintiffs do not specifically challenge the Commission's finding that the volume effects of Brazilian OSBQ bars are insignificant.

B. *Effects on Domestic Prices*

The Commission also found an absence of any significant depressing or suppressing

price effects attributable to LTFV imports of OSBQ bars from Brazil. *Final Determination* at 46–47. The Commission's conclusion relied on price trends data indicating that the prices of domestically-produced other special quality bars fluctuated within relatively narrow ranges during the 1990–1992 period. *Id.* at 42, I–88–89, Tables 43–47.[12] Additionally, the Commission discerned moderate price declines in several products, while other prices were deemed more stable. *Id.* Average prices for Brazilian products were noted to fluctuate within small ranges or to exhibit slight declining trends. *Id.* Prices for one domestic product, for which no Brazilian imports were reported, exhibited a significant decline in the last quarter of 1992. *Id.* at I–89, Table 48.

The record also indicates, and the Commission noted, that imports of other special quality bars and cut-length rods are relatively good substitutes for domestic other special quality bars. *Id.* at 43. The domestic and imported subject Brazilian imports of other special quality bar products were regarded by purchasers, producers and importers to be essentially equivalent in quality. *Id.* at I–85.

The Court disagrees with plaintiffs that price premiums by the domestic producers are irrelevant because the producers reduced prices to prevent volume losses, particularly as there were no confirmed lost sales or lost revenue allegations for all of 1992. *See id.* at 46. The Commission found that domestic hot-rolled special quality bars were sold at a 5% to 8% premium over subject imports reflecting, in part, shorter lead times. *Id.* at 43. Prices for Brazilian other special quality products were lower in 35 out of 45 pricing comparisons. *Id.* at I–91. Margins of underselling were generally small, with 34 out of 35 pricing comparisons below 10% and many below 5%. *Id.* at 44. The Commission

---

12. In the final investigation, the Commission did not obtain complete pricing data from a full range of domestic producers and only obtained importers' data from a small number of importers. Finding the purchasers' questionnaire pricing data more complete, the Commission relied primarily on the price data sourced from purchasers. *Final Determination* at 42 n. 168. The record confirms that data from domestic producers and importers was incomplete. This evidence disposes of plaintiffs' argument at pages 26–28 of their brief that the Commission's consideration of data from producers/importers pertaining to "bellwether" OSBQ bar products should have carried more weight. *See, e.g.,* C.R. Document No. 36 at I–133 and No. 20 at 46.

concluded that factoring in the price premium for domestic other special quality bars made the relatively small margins of underselling even less significant.[13] *Id.* Thus, the Commission appropriately examined whether there had been "significant price underselling" by the subject imports. *See* 19 U.S.C. § 1677(7)(C)(ii)(I). Evidence of underselling has been found to be less significant where there were price premiums for domestic products. *See Roses, Inc. v. United States,* 13 CIT 662, 665–66, 720 F.Supp. 180, 183 (1989) (62 out of 110 instances of underselling found insignificant because price premiums for locally-grown roses based on freshness and an ability to supply the flowers on a short-term need basis). *See also Trent Tube Div., Crucible Materials v. United States,* 14 CIT 386, 402, 741 F.Supp. 921, 935 (1990) (consistent underselling given less weight based on domestic price premium due to customer preferences and lead time differences, small volume of imports a consideration), *aff'd,* 975 F.2d 807 (Fed.Cir.1992). Thus, the Court cannot say that the Commission's conclusion was erroneous.

■ In assessing price effects based on the above data, the Commission relied on evidence of aggressive competition within the domestic industry. In particular, it noted that domestic "minimills" offered discounted prices to attract sales. *Final Determination* at 44 (relying on P.R. Document No. 170 at 40). At least 14 purchasers identified minimills as price leaders. C.R. Document No. 27, Exhibit 4. New domestic entrants, as well as existing participants, expanded production lines—particularly in the latter part of the POI—aggressively pricing OSBQ bars to consistently undercut domestic traditional mills as well as Brazilian subject imports.[14] *Id.* at 44–46. The record supports the Commission's conclusion that the emergence of the new domestic entrants and the expansion of existing domestic producers into the special quality bar market was facilitated by changes in reduction ratio specifications by large U.S. purchasers.[15] *See Final Determination* at 45 n. 183. Based upon this probative evidence, the Commission reasonably found an absence of price effects attributable to LTFV Brazilian imports of OSBQ bars. *See* 19 U.S.C. § 1677(7)(C)(ii)(II). The Court does not find error in the Commission's conclusion. Cumulatively, record evidence supports the Commission's determination.

## C. *Impact on the Domestic Industry*

The Commission confirmed several allegations of lost sales and revenues by the domestic industry during the 1990–1991 peri-

---

13. Chairman Newquist did not concur in this observation and Commissioner Nuzum noted that the fact that domestic producers were able to obtain some price premium compared with importers did not negate the possibility of adverse price effects by the subject imports. *Final Determination* at 44 nn. 179 & 180.

14. The Commission, in fact, considered a wide range of evidence. For example, record evidence demonstrates that one domestic purchaser bought more than [ ] tons of OSBQ bar from two so-called "new entrants" to the OSBQ market *between 1991 and 1992.* C.R. Document No. 27, Exhibit 5. Further, the questionnaire responses of 12 domestic purchasers of OSBQ bars indicated that the subject Brazilian imports were not available at a lower f.o.b. price than domestic products during 1992. C.R. Document No. 39, including 39.16, .18–19, .21, .29–30, .33, .37–38, .42–43 and .45. Brazilian prices were indicated to be [ ]. C.R. Document No. 22. There were [ ] instances of overselling out of [ ] comparisons by Brazilian OSBQ bars in 1992. C.R. Document No. 36, I–141–145. The Commission also relied on the testimony indicating that *as early as late 1990,* domestic prices, particularly those of sever-

al new entrants into the OSBQ market, were lower than subject Brazilian prices and undersold traditional integrated producers such as plaintiffs. *Final Determination* at 45–46; P.R. Document No. 186 at 159, 165–67.

15. The Commission found that, prior to 1990, most large U.S. purchasers of bars required and specified a reduction ratio of 10:1. To achieve this ratio, the surface area of the semifinished product had to be ten times larger than the surface area of the finished bars. Only producers of special quality bars with ingot casting or very large bloom casters could produce many sizes of special quality bars. Thus, domestic producers with continuous casters which produced only a semifinished billet of six inches or less in diameter could not compete. Beginning in 1990, however, a number of large domestic purchasers changed their reduction ratio specifications to accept the use of special quality bars rolled from smaller blooms and billets produced by the continuous casting method. *Final Determination* at 45 n. 183.

od.[16] However, the Commission was unable to confirm any such allegations for 1992. *Final Determination* at 46. Based on the absence of volume and price effects attributable to the subject imports, the Commission concluded that demonstrated lost sales and revenues had no more than a *de minimis* suppressing or depressing effect on the domestic industry as a whole. *Id.* at 46–47. Thus, the Commission examined the impact of the subject imports and reasonably found it insufficient to warrant an affirmative finding. The Commission's conclusion provides further support for its negative injury determination.

■ Finally, plaintiffs have argued that the Commission unlawfully weighed evidence of injury by the subject imports against evidence of other possible contributing factors. The Court finds this argument fundamentally flawed. As discussed above, substantial evidence supported the Commission's conclusion that, as of the date of its determination, there was no present material injury by reason of the subject imports. As there was no causal nexus, the Commission did not,[17] and could not, weigh causes. The Commission was presented with evidence that the cause of price suppression or depression, particularly in 1992, was aggressive domestic competition. It is clear that the Commission may consider evidence that the harm alleged to be attributed to LTFV imports is actually attributable to other factors. *See* S.Rep. No. 249, 96th Cong., 1st Sess. 75 (1979), *reprinted in* 1979 U.S.C.C.A.N. 461. *See also General Motors Corp. v. United States,* 17 CIT 679, 712, 827 F.Supp. 774, 788 (1993) (where no nexus between LTFV imports and injury was found, the Commission "did not err in noting other possible causes of injury"). Thus, the Commission acted properly in finding that any significant price suppression or depression in the OSBQ market was caused by aggressive domestic competition.

An affirmative injury determination cannot issue where the record does not support such a finding. In the case at bar, substantial evidence supports the Commission's negative material injury determination. Accordingly, the Court sustains the Commission's determination that the domestic industry was not materially injured by reason of LTFV imports of OSBQ imports from Brazil.

4. *The Commission's Negative Threat Finding*

Turning to the Commission's threat determination, plaintiffs advance two arguments in an attempt to overturn the negative determination. Plaintiffs first argue that the Commission's conclusion that the subject imports will not enter the United States in the immediate future at prices that will suppress or depress U.S. prices[18] was improperly based on an unlawful assessment of the present effect of the subject imports. *Plaintiffs' Brief* at 60–62. Plaintiffs argue that the Commission failed to take into account the expert opinions of plaintiffs' industry witnesses. *Id.* at 61; *Reply Memorandum of Republic Engineered Steels Inc. and The Timken Company in Support of Their Motion for Judgment Upon the Agency Record* at 27.

Second, plaintiffs argue that the Commission improperly ignored the likelihood of product shifting by Brazilian producers. In support, plaintiffs point out that (1) the Brazilian production processes of hot-rolled lead and bismuth carbon steel products and that of special quality bar are virtually identical; (2) lead and bismuth products are subject to an antidumping order; and (3) exporters of the lead and bismuth products also export other special quality steel. *Plaintiffs' Brief* at 3, 62–64; *Tr. of Oral Argument* at 22–23.

To determine whether a threat of material injury is posed by LTFV imports, the Commission must review, among other relevant economic factors, the following factors: for-

16. Commissioners Brunsdale and Crawford did not rely on anecdotal evidence of lost sales or price reductions by the domestic industry as a result of competition with the subject imports. *Id.* at 47 n. 191.

17. The Commission was cognizant that it was not to weigh causes. *See id.* at 33 n. 136.

18. In assessing immediate future harm resulting from domestic price suppression or depression by reason of the subject imports, the Commission relied on its finding in the causation analysis "that the subject imports have no present effect on prices." *Id.* at 57.

eign production capacity, market penetration, price suppression or depression, inventories of subject merchandise, underutilized foreign production capacity, potential for product shifting, and actual or potential negative effects on the industry's existing development and production efforts. *See* 19 U.S.C. § 1677(7)(F)(i); *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 982 (Fed.Cir.1994). An affirmative threat determination must be based on "evidence that the threat of material injury is real and that actual injury is imminent." 19 U.S.C. § 1677(7)(F)(ii). The Commission's determination may not be based on "mere conjecture or supposition." *Id.*

The record demonstrates that, in this case, market penetration by subject imports did not rapidly increase between 1990 and 1992. *Final Determination* at I–81, Table 36. Foreign production capacity rose only minimally during 1990–1992. Thus, the increase was deemed unlikely to result in a significant increase in subject imports.[19] *Id.* at 56–57. Brazilian production of the subject product was small and declined throughout the POI. *Id.* at 57, I–69, Table 29. Further, U.S. inventories of Brazilian bar increased only slightly between 1991 and 1992, rising to a level that "represented only a minuscule percentage of apparent U.S. domestic consumption." *Id.* at 57. Although unused Brazilian capacity for special quality bar increased somewhat during the POI, exports of the subject product to the United States, as a percentage of total Brazilian production, decreased. *Id.* at I–69, Table 29. The Commission determined that no credible evidence indicated that imports will have an adverse price effect in the immediate future on any domestic producers. *Id.* at 57.

■ Based on these findings, the Commission properly found no demonstrable trends

or evidence of threat by the subject LTFV imports. This conclusion is supported by the decline in volume of the subject imports in 1992 and the Commission's finding that these products are no longer the lowest cost OSBQ products available. Under the circumstances, the Commission properly gave less weight to the testimony of plaintiffs' witnesses regarding the price and volume effects of the subject imports. Notwithstanding, the Commission is afforded discretion in interpreting the data and the court does not weigh the evidence. *See Nippon Steel Corp. v. United States,* 19 CIT ——, ——, Slip Op. 95–57 at 69, 1995 WL 170410 (April 3, 1995). *See also Trent Tube Div.,* 14 CIT at 403, 741 F.Supp. at 935 (the Commission has considerable discretion in determining the weight which it will assign to a given factor in making its injury determination).

Moreover, the Court disagrees with plaintiffs that the Commission ignored the issue of product shifting. The Commission adopted, for OSBQ bars, the reasoning in its free-machining semifinished steel "product shifting" analysis. The Commission stated: "The foregoing paragraph also applies to the other three domestic industries." *Final Determination* at 52 n. 212.[20] Thus, the Commission examined the possibility that Brazilian producers would shift their production of lead and bismuth bar products to OSBQ bars to circumvent the antidumping duty order imposed on the lead and bismuth products and found the possibility insupportable. *See id.* at 51–53, 56–58.

Accordingly, as the Commission's threat analysis is supported by substantial evidence, the Court affirms the Commission's negative determination that Brazilian imports of the subject product do not pose an imminent threat of material injury to the domestic industry.

---

**19.** The Commission found that no evidence suggested that Brazilian excess capacity would suddenly be used to produce large quantities of the subject products which will be diverted for sale in the United States. *See id.* at 50 n. 204. Also, no adverse trends existed suggesting plans to expand Brazil's manufacturing capacity for the subject products. *See id.* at 51 n. 207.

**20.** The Commission also found that no increase in Brazilian shipments of the subject product to the United States resulted as a consequence of the preliminary antidumping duty order in the lead and bismuth case. *See id.* at 52 n. 211.

In sum, the Court has examined the administrative record and is convinced that the Commission's negative injury and threat determination is supported by substantial evidence on the record and is in accordance with law. Therefore, the Commission appropriately denied relief to the domestic industry.

*Conclusion*

The Court has been unpersuaded by plaintiffs' supporting arguments in this challenge. Plaintiffs have failed to demonstrate error in the Commission's negative present material injury and threat determination concerning OSBQ bars from Brazil. The motion at bar is, therefore, denied and this action is dismissed.

## JUDGMENT

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that plaintiffs' motion for judgment upon the agency record is denied in all respects and the final negative material injury and threat of material injury determination of the International Trade Commission concerning *Certain Special Quality Carbon and Alloy Hot–Rolled Steel Bars and Rods and Semifinished Products From Brazil,* USITC Pub. 2662, Inv. No. 731–TA–572 (July 1993), 58 Fed.Reg. 38,138 (USITC 1993) (final), is sustained; and it is further

**ORDERED** that this action is dismissed.