**Slip Op. 03-73**

# UNITED STATES COURT OF INTERNATIONAL TRADE

---

|  |  |  |
|---|---|---|
| **THE COMMITTEE FOR FAIR BEAM IMPORTS, ET AL.,** | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| v. | : | **Ct. No. 02-00531** |
| **UNITED STATES, and THE UNITED STATES INTERNATIONAL TRADE COMMISSION,** | : | **Public Version** |
| | : | |
| **Defendants,** | : | |
| **and** | : | |
| **SALZGITTER AG STAHL UND TECHNOLOGIE, ET AL.,** | : | |
| **Defendant-Intervenors.** | : | |

---

[Plaintiffs' Motion for Judgment upon an Agency Record is denied.]

Decided: June 27, 2003

*Wiley Rein & Fielding LLP, Charles Owen Verrill, Jr., Alan H. Price, (John R. Shane), Daniel B. Pickard,* for Plaintiffs.

*Lyn M. Schlitt,* General Counsel, Office of General Counsel, United States International Trade Commission, *James M. Lyons,* Deputy General Counsel, *(Marc A. Bernstein)*, for Defendants.

*DeKieffer & Horgan*, *(J. Kevin Horgan), Marc E. Montalbine, Merritt R. Blakeslee, Wakako O. Takatori,* for Defendant-Intervenor Salzgitter AG Stahl und Technologie.

*Shearman & Sterling, Jeffrey M. Winton, (Christopher M. Ryan)*, for Defendant-Intervenors Stahlwerk Thuringen Gmbh, TradeARBED, Inc., ProfilARBED, S.A., and Aceralia Corporacion Siderurgica, S.A.

## OPINION

**BARZILAY, JUDGE:**

### I. INTRODUCTION

Plaintiffs, The Committee for Fair Beam Imports and its individual members, Nucor

Corporation, Nucor-Yamato Steel Company, and TXI Chaparral Steel Company, (collectively

"Fair Beam" or "domestic industry") challenge the final negative material injury and the final

negative threat of material injury determinations of the United States International Trade

Commission ("ITC" or "Commission"), set forth in *Certain Structural Steel Beams from China,*

*Germany, Luxembourg, Russia, South Africa, Spain and Taiwan*, Invs. Nos. 731-TA-935-936

and 938-942 (Final), USITC Pub. No. 3522 (June 2002) (*"Final Determination"* or *"Beams II"*)[1]

and made pursuant to 19 U.S.C. §§ 1671d(b) and 1673d(b) (1999). This court has jurisdiction

pursuant to 19 U.S.C. § 1516a(a)(1) and 28 U.S.C. § 1581(c). For the reasons outlined below,

Fair Beam's USCIT R. 56.2 Motion for Judgment upon an Agency Record is denied.

### II. BACKGROUND

A.      Procedural History.

On May 23, 2001, the domestic industry filed petitions with the United States Department

of Commerce ("Commerce") and the Commission which led to investigations by both

---

[1] This opinion cites to the version of this document included in *Administrative Record*, List 2, Doc. No. 170.

concerning structural steel beams of certain specifications[2] imported from China, Germany, Luxembourg, Russia, South Africa, Spain, and Taiwan ("subject countries" or "respondents").[3] Preliminary results were issued by the Commission on July 16, 2001, and by Commerce, on December 28, 2001. In May 2002, Commerce issued its final determinations. *See* 67 Fed. Reg. 35,479 - 35,490 & 35,497. A hearing was held before the Commission on May 15, 2002.[4] Notice of the Commission's final determination was published in the Federal Register on June 27, 2002. *See* 67 Fed. Reg. 43,340. A panel of five Commissioners found no present material injury from subject imports. One Commissioner, however, dissented from the panel's negative determination with regard to threat of material injury.

B.      The product and the U.S. market.

Structural steel beams are load-bearing support members in the construction of large steel structures, such as buildings, bridges, towers, pre-fabricated homes, ships, and equipment. Demand for structural beams fluctuates in tandem with construction activity which in turn tracks

---

[2] The subject of this investigation is "doubly-symmetric shapes, whether hot-or cold-rolled, drawn, extruded, formed or finished, having at least one dimension of at least 80 mm (3.2 inches or more), whether of carbon or alloy (other than stainless) steel, and whether or not drilled, punched, notched, painted, coated, or clad." *E.g., Notice of Final Determination of Sales at Less than Fair Value: Structural Steel Beams from the People's Republic of China*, 67 Fed. Reg. 35,479 (May 20, 2002). The court notes that no scope or domestic like product issues are raised in this appeal.

[3] Initially, Italy was also investigated. However, upon a finding of no dumping by Commerce, the ITC discontinued its investigation of Italian structural beams. For the same reason, one company from the People's Republic of China was eliminated from the investigation. The court further notes that no cumulation issues are raised in this appeal.

[4] "*ITC Hearing Tr.*" will signify the transcript of this administrative hearing, portions of which are included in tab 5 of Plaintiffs' Appendix.

aggregate U.S. economic activity.  *Certain Structural Steel Beams from China, Germany, Luxembourg, Russia, South Africa, Spain, and Taiwan*, Staff Report to the Commission on Invs. Nos. 731-TA-935-936 and 938-942 (Final) at I-6 & II-10 (June 3, 2002) ("*Staff Report*") in *Administrative Record*, List 2, Doc. No. 169.  In the U.S. market, there are two types of purchasers of structural steel beams: distributors (or service centers) and end users (or fabricators).[5]  *Id.* at II-1.  Imported product is mostly sold to distributors; end users, however, typically buy from domestic suppliers.  Distributors keep inventories while end users do not.  Domestic mills charge the same price to both distributors and end users.  In the event an end user buys from a distributor, it accordingly pays a higher price.  Purchasers rank domestic product superior in availability and delivery time[6] to imported product, but inferior in price.  *Id.* at II-13.  On the other hand, domestic and imported product are perceived to be comparable in product quality and consistency.  Purchasers of structural steel beams report evaluating factors such as price, quality, and availability in determining whether to purchase domestic or imported beams and rank these factors in a descending order of importance.[7]  *Id.* at II-12.

---

[5] Construction companies are the ultimate users of the finished product.

[6] There is a three to five month "lead time" for subject imports whereas the lead time for domestic beams is shorter, *Final Determination* at 23, although not by "very much," *ITC Hearing Tr.* at 26 (testimony of domestic executive).  Orders for beams are therefore necessarily a function of perceptions of future demand and not of current demand conditions.

[7] Price comes before all else under normal circumstances according to testimony offered at the administrative hearing.  *See ITC Hearing Tr.* at 49 ("Price is the defining factor in determining who receives the order.").  The ITC in the *Final Determination*, however, paid virtually no heed to this information because of its implicit finding that in a time of supply shortage, purchasers are willing to pay more to circumvent the domestic unavailability of the product – which determination is more fully explained below.  In connection with the price variable, the court also notes that at the administrative hearing at least one respondent witness

The short-term price elasticity of U.S. demand for structural steel beams is low reflecting lack of substitutes for steel beams in construction, especially after the design phase of construction is complete. *Id.* at II-9. In other words, once the quantity of beams requested is set, later price variation will have no or little effect.[8]

On the supply side, the price elasticity of domestic supply is lower than that of the subject countries' supply. *Staff Report* at II-16 & 17. That is, subject countries can respond to price changes in the U.S. market faster than domestic producers can in terms of increasing shipments to the U.S. market.[9] The price elasticity of supply is dependent on excess capacity, ability to shift production or alter capacity, inventories, and availability of alternate markets. The relatively greater flexibility of the subject countries is partially due to the existence of home markets and alternate export markets from which they are able to divert products to the U.S. market with relative ease.

The largest share of cost in the production of structural steel beams is that of steel scrap, the raw material from which beams are produced. *Id.* at V-I. Thus, the supply of beams is tied to

---

denoted respondents as price takers. *See id.* at 199-200. In other words, respondents normally peg their price to that of the market leader, Nucor, a domestic producer. In this period, however, because Chaparral Steel, another domestic producer, "was playing a little bit havoc with the market," Chaparral Steel's price was matched. *Id.* at 200.

[8] Potential long-run substitutes for structural steel beams include reinforced concrete, structural tubing or wood. *Staff Report* at II-10 & 11. The *Staff Report* also indicated that "building design typically precedes construction and material purchases by months or even years," which period can be termed "the long-run" in this context. *Id.* at II-11.

[9] The *Staff Report* estimated that for every one percent increase in U.S. price, domestic producers could increase shipments either by one or two percent, as opposed to ten or twenty percent by subject countries. *Staff Report* at II-17.

the price of steel scrap.[10]  It has also been determined that in offers domestic producers use price lists whereas sales of subject imports are on a transaction-by-transaction basis, price and quantity being determined by the then existing market conditions.[11]  *Staff Report* at V-7.

C.       The ITC's findings in the *Final Determination*.

In the *Final Determination*, the ITC evaluated the prevailing market conditions during the period of investigation ("POI").  *See Final Determination* at 17-21.  Consulting Census Bureau statistics, the ITC determined that nonresidential construction activity in the United States, which is an indicator of U.S. demand for structural steel beams, increased from 1999 to 2000 and declined in 2001.  Using its own questionnaires and official Commerce import statistics, the ITC further observed that apparent U.S. consumption of steel beams rose from 4.96 million short tons in 1999 to 6.23 million in 2000, and then declined to 4.81 million in 2001.

The ITC next noted that the domestic industry experienced supply difficulties during 1999 and the first half of 2000.  The ITC based this finding on questionnaire responses of forty-five purchasers, eighteen of which (sixteen of thirty-one distributors) represented that they either were put on "allocation" during this time period by domestic producers or were otherwise unable to meet their requirements from domestic suppliers.  The ITC further noted questionnaire responses of the largest domestic producers which confirmed that purchasers were "allocated a

---

[10] During this period of investigation, scrap prices increased throughout 1999, reaching a peak in January 2000, and followed a general declining trend for the rest of the period, arriving at a low in November 2001.  *Staff Report* at V-1.

[11] In the *Final Determination*, the ITC observed that domestic producers on occasion deviated from list prices.  *Final Determination* at 26 n.100.

portion of production based on historical levels of purchases" in applicable products.[12]  *Staff Report* at II-2.  The ITC also referenced news articles in trade publications which reported a domestic supply shortage in this time period.[13]

The ITC's finding of domestic supply shortage was informed by an additional observation that imports of structural steel beams from Japan became subject to a June 2000 antidumping duty order, and imports of structural steel beams from Korea became subject to antidumping and countervailing duty orders in August 2000.

Finally, the ITC noted the changes to domestic production during the POI.  Two new domestic mills (Nucor and TXI) became operational during 1999 with a third (Steel Dynamics, Inc.) expected to become operational in 2002.  On the other hand, another domestic firm (Northwestern Steel & Wire Company) completely shut down its operations in May 2001.

### i. Subject import volumes.

In a material injury investigation, the statute requires the Commission to determine whether a domestic industry "(i) is materially injured, or (ii) is threatened with material injury . . . by reason of imports."  19 U.S.C. § 1673d(b)(1).  The statute defines "material injury" as "harm

---

[12] These domestic producers, Nucor-Yamato and TXI, together produced approximately [[   ]] of domestic structural steel beams in 2001.  *Staff Report* at III-2.  The *Staff Report* further pointed out that Nucor denied putting its Berkeley plant customers on "allocation" and that a Northwestern Steel & Wire Company witness testified that this domestic producer, which eventually went out of business, "was begging for orders" during this time.  *Staff Report* at II-2 n.3.

[13] Another piece of evidence supporting the existence of domestic shortage during the POI is the observation that the "average lead time" for domestic producers' delivery increased in 2000 from its 1999 level.  *Staff Report* at II-2 n.4; *Final Determination* at 18.  The court additionally notes that counsel for Fair Beam all but conceded the presence of a supply shortage at oral argument before this court.  *Oral Arg. Tr.* at 9:16-17 ("there was clearly a shortage").

which is not inconsequential, immaterial, or unimportant." § 1677(7)(A). In making a material injury determination, the statute first requires the ITC to consider the "volume" of subject imports already determined to be sold at less-than-fair value. § 1677(7)(B)(i)(I). In particular, the ITC shall consider whether the volume of subject imports (or any change therein) in either absolute or relative terms is "significant" during the POI. § 1677(7)(C)(i).

In the *Final Determination*, the ITC observed that the volume of subject imports rose from 331,436 short tons in 1999 to 772,809 in 2000, and then fell to 300,150 in 2001 (to a level lower than its 1999 level). *Final Determination* at 21. The value (as opposed to quantity) of subject imports followed a similar curve. These numbers represented a market penetration by subject imports of 6.7% in 1999, 12.4% in 2000, and 6.2% in 2001. The ITC linked the rise in U.S. market penetration of subject imports to its finding that the domestic industry was experiencing supply difficulties. Accounting for the gap in time between order placement and delivery, the ITC noted that changes in volume of subject imports trailed the domestic supply conditions, with the domestic shortage and its subsequent alleviation responsible for the rise and in part for the later fall of subject imports during the POI. *Id.* at 23.

Before the ITC, the domestic industry had argued that the increase in demand during 2000 was "relatively modest," and therefore the domestic industry could satisfy "real" demand with their supplies – which argument was an attempt to dispute the domestic shortage finding of the ITC. The ITC responded by noting that instead of contemporaneous demand conditions, perceptions about future demand are what stimulate orders. *Id.* at 22. As evidence of purchasers' expectations of strong future demand during the POI, the ITC cited testimony by one

fabricator and the predictions of a trade publication, which incidentally also reported "major concerns about steel availability." *Id.* at 22-23. In the ITC's scenario of events, expected strong demand and limited domestic supply led to an increase in purchases of subject imports (especially by distributors). The ITC further acknowledged that by the third quarter of 2000, the domestic supply situation improved and, after import volumes had reached their peak in August 2000, orders for subject imports began to fall. *Id.* at 23.

Further, the ITC remarked that subject import volumes started to fall "well before" the filing of the May 2001 petition that initiated the present investigation. *Id.* at 23-24. Consistent with this observation, the ITC pronounced that the filing of the petition had "limited" impact on the decline of subject import volumes in 2001 and, accordingly, the ITC did not "reduce the weight" accorded to the 2001 data. The ITC finally concluded that resolution of domestic shortages coupled with decline in demand led to a decline in subject import quantities in this period.

After thus accounting both for the upward movement of subject import volumes from 1999 to 2000 and their decline from 2000 to 2001, the ITC went on to say: "[I]n light of the foregoing conditions of competition and the lack of price effects discussed below, we find that the volume of subject imports is not significant." *Id.* at 24.

*ii. Price effects.*

The statute also requires the ITC to consider the "effect of imports . . . on prices in the United States for domestic like products." § 1677(7)(B)(i)(II). In particular, the ITC is required to analyze whether "there has been significant price underselling" of imports compared with

domestic products and whether "the effect of imports . . . otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." § 1677(7)(C)(ii)(I) & (II).

Comparing domestic prices with subject import prices, the ITC first found that prices of subject imports reflected "a mixed pattern of overselling and underselling" the domestic product during the POI. *Final Determination* at 25. In particular, subject imports undersold the domestic product in 90 of 147 quarterly comparisons. *Id.*; *Staff Report* at V-17 & V-18. The ITC noted that product 1, a type of structural steel beams (wide-flange beams of 8 to 14 inches), experienced the "most intense" competition because it was the most widely sold and additionally had the most complete pricing data from the subject countries. *Final Determination* at 26. Isolating the price information for this product, the ITC observed that prices of product 1 exhibited 22 occasions of underselling and 32 occasions of overselling. To estimate underselling more accurately, the ITC also conducted a second comparison which incorporated the differing delivery times of subject imports and domestic product. In this comparison, the incidence of underselling for product 1 increased to 27 and that of overselling decreased to 25. Even though in this instance underselling occurred more frequently than overselling, the ITC nevertheless emphasized that "still more tonnage was oversold."[14] *Id.* at 26 n.100; *Staff Report* at V-9 & V-10.

While also acknowledging that other products under investigation exhibited greater

---

[14] Despite the domestic industry's objections, the ITC used actual sale prices rather than list prices in comparisons because this method was the Commission's customary practice and because the record established that domestic producers on occasion deviated from list prices. *Final Determination* at 26 n.100 (citing Fair Beam's Prehearing Brief before the agency).

incidence of underselling, the ITC noted that the domestic product was typically sold at a premium, the existence of which was established at the administrative hearing by testimony of four domestic industry witnesses (also characterizing the premium of $10 to $40 per ton as "small") and one respondents witness (adding that the premium could more than double in a "very weak market").[15] *Final Determination* at 25 n.98; *ITC Hearing Tr.* at 232. The ITC attributed the more frequent occurrence of underselling (as opposed to overselling) to the premium. The ITC additionally observed that subject imports continued to increase even though some subject import prices were higher than domestic price levels. *Final Determination* at 27. The ITC concluded that "[t]hese factors all serve to diminish the significance of the underselling that was observed." *Id.*

Next, the ITC noted that in 2000 the volume of imports was at its highest level when both domestic and subject import prices were highest. Prices of subject imports sharply rose from 1999 to their peak in 2000 and declined in 2001, following a trend similar to that of subject import volumes. *Id.*; *Staff Report* at V-9 to V-16. The ITC thus pronounced that "factors other than competition from subject imports were responsible for price movement of the domestically produced product." *Final Determination* at 27. In identifying domestic shortages as the likely culprit, the ITC observed that "[p]rice increases are a natural function of supply shortages." *Id*. at 28.

The ITC further noted that once the domestic supply shortage was alleviated, prices along

---

[15] The premium is due to some non-price considerations, such as domestic producers' geographical proximity. *See ITC Hearing Tr.* at 200. Testimony was also presented to the effect that the premium was exacerbated in recent years due to strong dollar. *See id.* at 204.

with subject imports declined. According to the ITC, "the sharp decline in prices observed during 2001 cannot be a function of that year's subject import volumes, which declined sharply, [and it] also cannot be a function of subject imports entering the U.S. market in 2000 at rising prices that were sometimes above those for the domestically produced product." *Id*. The reason for the fall in price, the ITC determined, was the misestimation of the 2001 demand (which in fact declined from its 2000 level) by purchasers who placed their orders earlier and the consequential rise in distributors' inventories – which can also be termed as an "oversupply" in the market.[16] *Id*. at 28-29.

The ITC ended its price effects analysis by stating that:

> We cannot conclude that the record indicates that either the inventory overhang or the resulting price declines were the function of the subject imports. High and increasing subject import prices during the portion of 2000 when subject import volumes increased cannot explain subsequent price declines. Nor, in light of the subject import pricing and volume patterns, can there be any nexus between the subject imports and business decisions by steel service centers to increase purchases that proved, in retrospect, to be wrong. We consequently conclude that the subject imports did not have significant price-depressing or -suppressing effects.

*Id.* at 29-30.

### iii. Impact.

The last component of a material injury determination is the analysis of the impact of

---

[16] Fair Beam submitted to the ITC the conclusions of an econometric model which predicted that subject imports affected prices with a nine month lag. *See Final Determination* at 29 n.107. The ITC found that the model failed because it did not take into account changes in domestic supply capabilities. To rebut the predictions of the model the ITC cited testimony from industry players to the effect that price competition occurs when an order is placed.

subject imports sold at less-than-fair value on the domestic industry.[17]  The ITC is statutorily required to consider "all relevant economic factors" that bear on "the business cycle and conditions of competition" in the industry, including changes in output, sales, inventories, capacity utilization, market share, employment, wages, productivity, profits, cash flow, return on investment, ability to raise capital, and R&D.  § 1677(7)(C)(iii).  In addition, the 1994 amendments to the statute now require the ITC to consider the size of dumping margins determined in an anti-dumping investigation.[18]  § 1677(7)(C)(iii)(V); The Uruguay Round Agreements Act, Statement of Administrative Action ("SAA") at 850, *reprinted in* 1994 U.S.C.C.A.N. at 4040, 4184.  No single factor is dispositive.  *See* § 1677(7)(E)(ii) ("The presence or absence of any factor which the Commission is required to evaluate under subparagraph (C) . . . shall not necessarily give decisive guidance" to a material injury determination).

In the *Final Determination*, the ITC observed that apparent U.S. consumption of structural steel beams, domestic output indicators (such as capacity, capacity utilization, production, and U.S. shipments), domestic sales revenues (including per unit sales values, the domestic industry's operating income and margins), employment indicators (such as number of workers, productivity, hours worked, and wages paid) – all followed a pattern of increase from

---

[17] Besides volume, price, and impact, the ITC "may [also] consider such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports."  § 1677(7)(B)(ii).

[18] Here, the ITC's consideration of dumping margins was limited to a listing of amended dumping margins for companies in subject countries.  *Final Determination* at 30 n.110.  The *Final Determination*'s consideration of dumping margins is, however, not on review before the court because it was not raised.

1999 to 2000 and decline from 2000 to 2001. *Final Determination* at 31-34; *Staff Report* at VI-2. In contrast, the ITC found that domestic producers' inventories, hourly wages, and R&D steadily increased, and industry capital expenditures decreased from 1999 to 2001. More significantly, the ITC determined that the domestic industry's market share (as measured by domestic output's share in U.S. consumption), despite a "modest" decline in 2000, was actually higher in 2001 than it was in 1999 (specifically, 81.1% in 1999, 79.8% in 2000, and 90.3% in 2001). *Final Determination* at 31-32. Thus, the ITC dubbed the 2000 loss of market share by the domestic industry a "temporary phenomenon." *Id.* at 32.

The ITC concluded that domestic industry's overall performance improved from 1999 to 2000, when imports were at their peak, and that none of the components that led to decline in performance from 2000 to 2001 were a result of the increase in imports. *Id.* at 33. The ITC attributed the decline in prices of the 2000-2001 period to increasing supply and declining demand for this period. Accordingly, the ITC determined that "the subject imports did not have a significant adverse impact on the domestic structural steel beams industry." *Id.* at 34.

### iv. *Threat of material injury.*

The statute also protects the domestic industry from a threat of material injury (as opposed to a present material injury) on account of imports sold at less-than-fair value in the U.S. market. To be able to conclude that the domestic industry is thus threatened, the ITC must find whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued." § 1677(7)(F)(ii). The ITC is required to evaluate the threat factors outlined in section 1677(7)(F)(i).

In the *Final Determination*, the ITC first looked at subject import volume and market penetration, emphasizing that, even though increasing in the beginning of the POI, both variables exhibited a sharp decline at the end of the POI. *Final Determination* at 36. The ITC found "no current shortages of domestic supply and no likelihood of shortages in the imminent future." *Id.* In connection with this finding, the ITC stressed that TXI had solved its problems at its Petersburg mill and a new Steel Dynamics, Inc. mill was in the works. Further, although the subject countries projected an increase in imports in both 2002 and 2003, the projections fell short of their peak in 2000. *Id.* at 37. The subject countries had ready markets at home and abroad, and that, although there was some "ability to shift exports from other markets to the United States," it was "unlikely that subject imports [would] increase to significant levels," given the decline in subject imports in 2001.[19] *Id.* Capacity utilization in the subject countries persisted at high levels during the POI, and further increases in both capacity and capacity utilization were anticipated in 2002 and 2003; the ITC thus found that there was no indication in the record of an "imminent" increase in subject volumes. Moreover, subject countries presented testimony (by one of their executives) rebutting the contention that an impending increase in subject imports was likely. *Id.* at 38 n.142; *ITC Hearing Tr.* at 201-202.

The ITC additionally pointed to the lack of any significant price effects in the POI and predicted that such would continue in the imminent future. *Final Determination* at 38. With respect to subject countries' inventories, the ITC observed that despite an increase in inventories, not all of the inventoried beams were suitable for sale in the United States because they did not

---

[19] Here, the ITC noted outstanding antidumping duty orders against Russia by Korea and Taiwan and against South Africa by Australia. *See Final Determination* at 37 n.141.

conform to the U.S. standard.  Moreover, even though other products which could be substituted for structural steel beams in production were subject to U.S. safeguards tariffs (as in the case of hot-rolled bar) – with the implication that more structural steel beams could be produced –, the ITC maintained that "[n]evertheless, as previously noted, we do not believe that the presence or potential for additional productive capacity in the subject countries is likely to lead to substantially increased imports." *Id.* at 39.

Finally, the ITC decided that the domestic industry was not in a "vulnerable state" because the industry remained "profitable overall" despite variable performances of individual producers and was also "characterized by the recent and imminent expansion of capacity at new and efficient production facilities." *Id.*  The ITC concluded:

> Accordingly, we find that material injury by reason of subject imports will not occur absent issuance of antidumping orders against the subject imports.  We therefore conclude that the domestic structural steel beams industry is not threatened with material injury by reason of the subject imports.

*Id.*

### III. DISCUSSION

The court must uphold the Commission's determinations unless they are unsupported by substantial evidence on the record, or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938).

A. **The ITC is under no obligation to follow its prior factual determinations in subsequent investigations.**

*Parties' arguments.*

Fair Beam charges that determinations made in the *Final Determination* (which Fair Beam denotes as *Beams II*) are "factually and logically inconsistent with the underlying record" and also with an earlier ITC decision, *Certain Structural Steel Beams from Japan*, Inv. No. 731-TA-853 (Final), USITC Pub. No. 3308 (June 2000) ("*Beams I*") in *Pls.' App.* tab 3. *See Pls.' Br.* at 8. In *Beams I*, the ITC found that the domestic industry was materially injured or threatened with material injury by reason of structural steel beams imported from Japan.[20] *Beams I* at 3. Fair Beam makes this argument by focusing on the language found in a recent United States Court of International Trade case, *Usinor v. United States*, Slip Op. 02-70 (July 19, 2002) ("*Usinor*"). The *Usinor* court, while acknowledging that "each injury or investigation is *sui generis*, involving a unique combination and interaction of many economic variables," emphasized that the ITC "may not disregard previous findings of a general nature that bear directly upon the current review." *Usinor* at 39 (quotation omitted). In *Usinor*, the issue was whether the ITC can assert in one case that the countries in the European Union ("EU") were "export oriented," poised to export to the United States, after having found in an earlier case that the primary marketing focus of one European country was the European market. *Id.* at 38-39.

---

[20] This determination was subsequently adopted with respect to Korea by virtue of almost identical administrative records in both cases. *See Certain Structural Steel Beams from Korea*, Invs. Nos. 701-TA-401 and 731-TA-854 (Final), USITC Pub. No. 3326 (August 2000). In *Beams I* material injury and threat of material injury determinations were not unanimous, with three Commissioners finding material injury and the other three finding threat of material injury.

According to *Usinor*, the "observations regarding EU markets [were] general in nature and [did]

not depend on the specific products at issue." *Id.* at 39-40. The *Usinor* court accordingly

ordered the ITC to sufficiently explain its contradictory positions. Basing its argument on

*Usinor*, Fair Beam contends that observations on "general market dynamics" are sufficiently "of

a general nature." *Pls.' Br.* at 9. Fair Beam adds that "*Beams I* and *Beams II* involved the same

product, the same domestic producers, the same volume trends, the same manifestation of injury,

in overlapping periods of investigation." *Id.*

On the other hand, the ITC emphasizes the *sui generis* nature of injury investigations.

*See Def.'s Br.* at 8. ITC cites prior cases of this Court which rejected the argument, among

others, that the ITC was required to use the same volume and price analysis in subsequent

investigations for the same product. *See id.* at 9 (citation omitted). The ITC stresses the

difference between "agency practice," which would have precedential value, and case-specific

determinations, which would not. *See id.* at 10 (citing *Ranchers-Cattlemen Action Legal

Foundation v. United States*, 23 CIT 861, 884-85, 74 F. Supp. 2d 1353, 1374 (1999)). The ITC

concludes that because *Beams I* or *Beams II*'s factual determinations are not "of a general nature"

under *Usinor*, but based on specific facts, *Beams II* need not have followed *Beams I*. *See id.* at

10-11.

The ITC argues in the alternative that even assuming such factual determinations are "of a

general nature," the "ITC acts in accordance with law when it either follows or distinguishes such

determinations." *Id.* at 11 (citation omitted). The ITC points to footnote 105 in *Beams II*, where

the Commissioners rejected the argument that *Beams I* would have any precedential bearing on

the present investigation and further indicated that, in any event, the two investigations were factually different. For the ITC, footnote 105 serves to distinguish the *Beams II* investigation from the *Beams I* investigation sufficiently.

The arguments of Defendant-Intervenors Stahlwerk Thuringen Gmbh *et al.* ("Stahlwerk") and Salzgitter AG Stahl und Technologie ("Salzgitter") center on the rejection of Fair Beam's *Usinor* analysis. Specifically, Stahlwerk argues that the determinations of *Beams II* concerning volume, price, and impact are not "of a general nature," but fact-specific. *See Stahlwerk's Br.* at 7-8. Stahlwerk presents a doomsday scenario in which, were the court to agree with Fair Beam, the ITC would subsequently be required to consider "hundreds" of its prior determinations in every investigation in search of consistency. *Id.* at 9.

Salzgitter adds that the *Usinor* court clearly adhered to the familiar standard of substantial evidence and that the plaintiff in *Usinor* was challenging the ITC's construction of a statute, not fact findings.[21] *See Salzgitter Br.* at 6.

***Comparative Analysis of Beams I and the Final Determination (or Beams II)****.

An agency that engages in formal adjudication may not render arbitrary and inconsistent decisions. *See Greater Boston Television Corp. v. FCC,* 444 F.2d 841, 852 (D.C. Cir. 1970), *cert. denied,* 403 U.S. 923 (1971); *Chisholm v. Defense Logistics Agency*, 656 F.2d 42, 47 (3d Cir. 1981). Should the agency choose to deviate from a practice it consistently employed in the past for the evaluation and testing of a set of facts, it must delineate and give reasons for its

---

[21] The court questions this argument. It can find no indication in *Usinor* that the *Usinor* court was engaged in statutory construction with respect to the "export oriented" nature of the EU.

subsequent change of policy as to provide adequate guidance to parties affected by its actions and to present the reviewing court with a discernable basis to judge the discrepancy. *See Sec'y of Agriculture v. United States*, 347 U.S. 645, 652-53 (1954); *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed. Cir. 1997).

At the same time, it is an equally well-established proposition that the ITC's material injury determinations are *sui generis*; that is, the agency's findings and determinations are necessarily confined to a specific period of investigation with its attendant, peculiar set of circumstances. *See U.S. Steel Group v. United States*, 18 CIT 1190, 1213, 873 F. Supp. 673, 695 (1994) (quotation omitted). In *Beams I*, the period of investigation was from 1997 to 1999; in *Beams II*, from 1999 to 2001. Given the dynamic nature of the economy, rarely would circumstances and their multi-faceted interactions defining a period of material injury investigation exhibit sufficient similarity to those of another period.

Fair Beam is correct in that *Beams I* and *II* involved the same product, and subject imports were present in the U.S. market at noticeable and increasing levels in both periods of investigation. Yet the statute dictates the ITC to attach importance only to those increases in subject import quantities and to those price effects of the subject imports which are deemed "significant." § 1677(7)(C)(i) & (ii). Accordingly, the ITC first acknowledged in footnote 105 of the *Final Determination* that subject imports in *Beams I* "were entering the U.S. market at low and declining prices even after a period when the domestic industry was having difficulty satisfying demand."[22] *Final Determination* at 28 n.105. In contrast, a finding was made in the

_____

[22] The ITC in *Beams I* made a finding of supply shortage in the U.S. market in the fourth quarter of 1997 and the first two quarters of 1998. *Beams I* at 10. The ITC further observed that

*Beams II* investigation that both subject import volumes and prices were increasing during the first portion of the POI.

Second, the ITC further noted in the *Final Determination* that "the peak subject import volume and the increase in subject import volume in [*Beams I* were] substantially greater than in [*Beams II*]." *Id.* As a third observation, the ITC offered that in *Beams I* "the subject imports undersold the domestic like product in the *vast majority* of pricing comparisons." *Id.* (emphasis supplied). In *Beams II*, on the other hand, under- and overselling were approximately of equal frequency for product 1, the most widely traded product among structural steel beams and, even though more underselling than overselling occurred for other products, underselling was mitigated by the price premium. The ITC finally concluded in the *Final Determination* that "[a]s the accompanying discussion indicates, the record in these investigations is substantially different." *Id.*

The court agrees with the ITC that these three observations are of crucial importance to distinguish the underlying factual pattern of *Beams II* from that of *Beams I*. In a material injury determination, the ITC is required to determine whether a material injury to the domestic industry (or a threat thereof) occurred "by reason of" subject imports that are sold in the U.S. market at less-than-fair value. § 1671d(b)(1). That is, the record must support a sufficient nexus between the injury (or threat of injury) and subject imports. *See Goss Graphics Sys. v. United*

---

supply shortage "quickly reversed as subject imports escalated in March 1998 and surged thereafter through the first quarter of 1999," that "[t]he import surge far exceeded the prior shortfall in supply," and that "imports gained market share at the expense of the domestic industry." *Id.* at 11. Fair Beam represents that thereby the ITC in *Beams I* compared the size of the domestic shortage to the increase in subject imports.

*States*, 22 CIT 983, 989-90, 33 F. Supp. 2d 1082, 1089 (1998). Moreover, "evidence of *de minimis* (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute." *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), *quoted in Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 22 CIT 520, 523, 15 F. Supp. 2d 918, 922 (1998). In the *Final Determination* here, the ITC was unpersuaded by the argument that aggressive price cutting by the subject countries was what allowed subject imports to penetrate the U.S. market and subsequently cause injury to the domestic industry. Instead, the ITC attributed the rise in subject import volumes to a temporary domestic supply shortage observed during this period.

The ITC based its finding of domestic supply shortage on three separate pieces of evidence: questionnaire responses of purchasers and of domestic producers, and contemporaneous news articles in industry publications. The ITC noted that "[p]rice increases are a natural function of supply shortages." *Final Determination* at 28. The ITC further observed that subject import volumes were increasing alongside prices. According to the ITC, the rise in both the subject imports and prices was thus a consequence of the domestic supply shortage.

In *Beams II*, the domestic industry was temporarily unable to satisfy demand.[23] The domestic producers' inability to satisfy demand resulted in a supply shortage or an excess demand in the market. As purchasers competed for fewer available products, prices rose. In

---

[23] The domestic supply shortage may have been partially due to the exit of Japanese and Korean beams from the U.S. market, as the ITC implied, or to a positive shift in demand or to some other cause not easily discernable from the record. In any event, the "cause" of the domestic shortage is not relevant to the disposition of this case.

addition, the supply of the domestic industry was relatively more inelastic than the supply of the

subject countries *vis a vis* the U.S. market.  *See Staff Report* at II-16 & II-17.  That is, subject

producers could react to a rise in U.S. prices faster than their domestic counterparts in terms of

increasing shipment to the U.S. market.  As the subject countries diverted their goods to the U.S.

market to satisfy excess demand, subject import quantities began to rise and, as expected, this

phenomenon was observed alongside an increase in prices.[24]  Accordingly, the domestic shortage

was, more likely than not, responsible for the rise in both subject import volumes and prices.

In *Beams I*, however, prices were declining as the subject import volumes were

increasing.  In addition, the ITC found significantly more underselling than overselling the

domestic product by subject imports.  These two observations serve to show that in *Beams I* a

more immediate connection could have been made between subject imports and falling prices.

That is, it was likely that persistent price cutting by foreign exporters had led to the increase in

subject import volumes by spurring purchases of imports over the domestic product where a

domestic supply shortage by itself would have resulted in an increase in price.  Accordingly, in

*Beams I* the finding of domestic shortage was not as significant as in the *Final Determination*

here.

As urged by the ITC, this court also notes that in *Beams I* "[n]othwithstanding the

---

[24] The court notes that in the absence of subject imports the price rise may have been higher.  Not explicitly discussing this possibility, the ITC nevertheless found that the price effects were not significant.  It should also be noted that non-subject imports (other than Japanese and Korean beams which left the market due to the antidumping order) also increased from 1999 to 2000.  *See Final Determination* at 23 n.89; *Staff Report* at IV-6 & n.8.  This fact further undermines the contention that price cutting by subject countries caused the volumes of subject imports to rise.

decrease from 1998 levels, the 1999 volume of subject imports represent[ed] a 728-percent increase over the 1997 volume." *Beams I* at 12. In contrast, the volume of subject imports in *Beams II* showed a net decline over the POI. As a parallel observation, the domestic industry gained market share over the POI in *Beams II* (despite the dip in 2000) and lost market share in *Beams I*. This distinction between *Beams I* and *II* lends credence to the assertion that in *Beams I* subject imports penetrated the market in numbers which went beyond a temporary exploitation of a domestic shortage whereas in *Beams II* the rise in subject import volumes was a "temporary phenomenon." The court finally observes that subject countries in the two investigations were different, a factor which plays an especially important role in a threat determination. As a result, the court finds (as did the ITC) that *Beams I* does not constitute legal precedent for *Beams II* and the ITC's consideration of *Beams I* in footnote 105 of the *Final Determination* is sufficient to distinguish the two investigations factually.[25]

In addition, the court rejects Fair Beam's argument that *Beams II*'s factual findings concerning "general market dynamics" are "of a general nature" under *Usinor*. The "general market dynamics" Fair Beam refers to is presumably the statutory framework the ITC is required

---

[25] Fair Beam claims that the *Final Determination* should have addressed *Beams I* more extensively, beyond a mere footnote. The ITC responds that *Beams II* did not have to distinguish *Beams I* at all and, assuming that it did, footnote 105 in *Beams II* constitutes an adequate consideration of *Beams I*. The court observes that because Fair Beam raised *Beams I* as an "underlying theme" of its arguments before the agency, the ITC was correct in addressing *Beams I* in footnote 105. *Final Determination* at 28 n.105; *Altx, Inc. v. United States*, 25 CIT __, __, 167 F. Supp. 2d 1353, 1374 (2001) (the agency "must address significant arguments and evidence which seriously undermines its reasoning and conclusions"). In footnote 105, the ITC first pointed out that Fair Beam's *Beams I* argument called for no "response" as a "legal matter" and, to the extent the argument had merit as a "factual matter," the ITC sufficiently addressed the crucial distinctions between *Beams I* and *II* in concluding that the two investigations had substantially different records.

to follow in every material injury determination.  There is nothing in the statute or case law that requires the ITC to take as precedent any prior factual finding that was reached within this framework.  In *Usinor*, the finding "of a general nature" pertained to a particular attitude toward the market of subject producers in question.  Specifically, the *Usinor* court said that the ITC cannot reasonably claim that European countries are not export-oriented in one case and later retract that position without explanation.  While *Usinor* correctly supports the need for consistency in the ITC's determinations, as well as the need for reasoned explanation, this court observes that there is no finding in *Beams II* that is likely to be governed by *Usinor*.  The findings in *Beams II* are confined to observations on economic variables, which are necessarily volatile.  Fair Beam does not point to any determination in *Beams II* (or in *Beams I*) that bears on particular, persistent attitudes of trading countries which, because they persist within a sufficiently short interval of time, would arguably have called for the same treatment by the ITC in different investigations undertaken also close in time.  In addition, the fact that similar patterns are observed in different investigations with regard to some of the variables does not preclude a different interpretation of the patterns after viewing the entire economic environment as a whole.  In fact, the statute requires the ITC to evaluate patterns in a context, instead of encouraging an analysis of each piece in isolation.

**B.  THE ITC'S FINDING REGARDING THE SIGNIFICANCE OF SUBJECT IMPORT VOLUME IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW.**

*Parties' arguments.*

Fair Beam next argues that the *Final Determination*'s findings are unsupported by substantial evidence.  Fair Beam continues to compare the *Final Determination* to *Beams I* in this

portion of its arguments before the court, specifically with respect to similar volume trends found in the two investigations. *See Pls.' Br.* at 11. In addition, Fair Beam contends that the *Final Determination* should have compared the size of the domestic shortage with the size of the increase in subject import volumes as *Beams I* did. *Id.* at 12. That subject import volumes exceeded the domestic shortage may have meant that the surge in subject imports was not solely due to the domestic supply shortage.

Fair Beam also maintains that the *Final Determination* should have taken into account the impact of the filing of the petition on subject import volumes. *See id.* at 13. Fair Beam argues that the decrease in subject imports in the later part of the POI may have been in part due to the petition. Fair Beam points out that [[                    ]] importer withdrew from the market upon the filing of the petition. *See id.* at 14 (citing Fax from TradeARBED to its customers (dated June 7, 2001) in *Pls.' App.* tab 8 ("As is normal while under [an] investigation we are withdrawing from the market effective immediately.")).[26]

The ITC counters that, even if there was a sharp increase in subject import volumes, the statute requires the ITC to concentrate on the significance of such increase. *See Def.'s Br.* at 12. The ITC also contends that the *Final Determination* was correct in not discounting post-petition data because the decrease in subject import volumes preceded the filing of the petition. *See id.* at 13. Moreover, the Commissioners did not completely ignore the petition, but decided that it had

---

[26] At the administrative hearing an ARBED executive elaborated, "we never completely withdrew from the market." *ITC Hearing Tr.* at 199. The ITC appears not to have considered the letter as evidence in its determination on post-petition data. However, consistent with the court's evaluation of contradictory evidence under the substantial evidence standard, the court defers to the ITC's treatment of the letter in the *Final Determination*.

a "limited" impact.  *Id.*

***Subject import volume analysis***.

There is substantial evidence on the record to support the ITC's finding that the volume of subject imports was not "significant."  First, as noted earlier, there is substantial evidence in the record to support the existence of a domestic supply shortage in the U.S. structural steel beams market.  Second, there is substantial evidence in the record to support the ITC's analysis of relationships among economic variables during the POI.  Consulting data on both the subject import volumes and supply conditions, the ITC noted that the subject import quantities followed (with a temporal lag) the domestic supply conditions.  Subject imports started to increase in response to the domestic supply shortage in 1999 and declined between 2000 and 2001 when the shortage was shrinking.  Moreover, the ITC observed that in the beginning of the POI, purchasers overestimated future demand for structural steel beams, and towards the end of the POI, demand either declined or flattened with contraction in economic activity and construction.  The ITC pointed to specific sources of information and evidence in support of these findings in the form of testimony, published articles, and statistics.

On the other hand, Fair Beam can point to no evidence in support of its argument that the rise in the subject import volumes was "significant."  Fair Beam continues to engage in what this court considers a fruitless comparison between *Beams I* and the *Final Determination*.  In addition to what has been explored above, the court notes that, even though the subject import volumes rose and fell (thus demonstrated a similar pattern) in both periods of investigation, the market penetration by subject imports in the *Final Determination* was far from its magnitude in *Beams I*.

Fair Beam is additionally concerned that the relative sizes of the domestic shortage and subject import volumes should have been noted in the *Final Determination* as they had been in *Beams I.* However, there is nothing in the statute or case law which requires the ITC to compare the size of a shortage, the existence of which has been confirmed, with the increase in subject import volumes. The statute solely mandates the ITC to consider the volume of subject imports and assess its significance. *See* §§ 1677(7)(B) & (C). Because the precise course this analysis should take is not specified, the court must defer to reasonable and factually supported applications of the ITC's methods. *Usinor* at 6-7 ("we affirm the agency's factual determinations so long as they are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusions") (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 389, 7 F. Supp. 2d 997, 1000 (1998)); *BIC Corp. v. United States*, 21 CIT 448, 462, 964 F. Supp. 391, 404 (1997) ("because Congress has granted the Commission broad discretion to choose its methodology, [the court] will not disturb the Commission's choice unless it is unreasonable") (citation omitted).

The court further observes that, as noted above, the *Beams I* decision is not legally binding on the ITC in subsequent investigations and, therefore, does not serve as a framework for subsequent ITC determinations as far as the size of a domestic shortage or any other factual determination is concerned. Quite the contrary, *Beams I* and the *Final Determination* possess sufficient factual differences the most important of which (for our purposes here) is the fact that in *Beams I* the subject imports continued to persist in the U.S. market far above their levels in the beginning of the period. Had the increase in subject imports in *Beams I* been due to a domestic

shortage then present, the subsequent decline in volumes when the shortage disappeared would have been expected to mirror the increase in approximate magnitude. More importantly, to the extent the ITC in the *Final Determination* attributed the rise in subject import volumes to the domestic shortage, the Commissioners properly evaluated and observed the two variables together in finding that they followed a similar curve with a lag.

Finally, as urged by the ITC, the statute gives it discretion to reduce the weight it accords to post-petition data. *See* § 1677(7)(I). That is, the ITC "may" discount such data, with the implication that, where proper, it need not. *Id.* Here, the ITC observed that the decline in subject import volumes preceded the filing of the petition by a sufficient interval. Therefore, the ITC decided that the petition had a "limited" impact on the fall in subject import volumes at the end of the POI. Instead of the mere filing of the petition, the ITC determined that the alleviation of domestic supply shortage coupled with weak demand in this period contributed to the decrease in subject import volumes. The ITC's treatment of post-petition data was accordingly reasonable and supported by the record.

**C. THE ITC'S DETERMINATION THAT THERE WERE NO ADVERSE PRICE EFFECTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW.**

*Parties' arguments.*

Fair Beam next challenges the ITC's determination that the prices of structural steel beams were not suppressed by subject imports. *See Pls.' Br.* at 17. In particular, Fair Beam takes issue with the *Final Determination* which found (i) that underselling was not widespread, (ii) that underselling was mitigated by the premium the domestic product fetches in the market, and (iii) that there was more overselling than underselling with respect to product 1. Fair Beam

quotes another ITC material injury determination where the ITC observed that "in a commodity market characterized by intense price-based competition, a mixed pattern of under- and overselling is to be expected; such a pattern, together with increasing volume of subject imports, indicates that subject imports played a substantial role in the price declines in this market." *Certain Stainless Steel Plate from Belgium, Canada, Italy, Korea, South Africa, and Taiwan*, USITC Pub. No. 3188 (May 1999) at 19. Fair Beam maintains that when price comparisons were adjusted by lag time, there was more underselling than overselling for product 1 and that the data from 2000 shows "high margins" of underselling. *Pls.' Br.* at 16. Fair Beam next questions the ITC's finding of lack of causation between the increase in the volume of subject imports and the subsequent price declines. *Id.* at 17. Fair Beam emphasizes that a "price war" resulted from the entry of subject imports to the U.S. market, which, it claims, was ignored by the ITC. *Id.* at 18. Consistent with its "price war" theory, Fair Beam also rejects the ITC's observation that because the peak in import volumes coincided with the peak in prices, the increase in both was due to a shortage in domestically supplied steel beam. For Fair Beam, this observation ignores the delayed price effects of subject imports "due to the build-up of inventories." *Id.* at 19. Fair Beam argues that "subject imports triggered a buying spree by service centers, which led to large inventory build-ups, and which ultimately caused a domestic price collapse." *Id.* at 20.

The ITC first argues that the ITC thoroughly considered the record data of underselling. *See Def.'s Br.* at 16. The ITC provides numbers in support of its position that "large quantities" of beams were oversold at "substantial margins," even in 2000. *Id.* at 18. The ITC urges that

under- and overselling data should be evaluated in context. In particular, the ITC emphasizes that a price war, if any, did not start until the third quarter of 2000, well into the POI. The ITC cites case law to show that "the ITC need not find underselling significant merely because there are more instances of underselling than overselling." *Id.* (citations omitted). The ITC further points out that in *Timken Co. v. United States*, the Court upheld the ITC's conclusion that the price premium for the domestic product mitigated the significance of underselling. 20 CIT 76, 87-88, 913 F. Supp. 580, 590 (1996).

***Price effects analysis***.

The court finds that the ITC's negative determination with respect to the significance of price underselling is supported by substantial evidence in the record. In the *Final Determination*, the ITC first engaged, as required by the statute, in a comparison of prices of domestic and imported product. The ITC used the tabulations of domestic and import prices contained in the *Staff Report*. In these price comparisons, employing two slightly different methodologies, the ITC found a "mixed pattern" of under- and overselling and further noted that, for product 1, the incidences of underselling, despite slightly outnumbering overselling when a lag was incorporated, were nevertheless less infrequent than overselling in the absence of the lag.[27] The ITC additionally observed that quantity oversold was greater than quantity undersold. The ITC proceeded to attribute the admittedly frequent occurrence of underselling for other products to

---

[27] Contrary to Fair Beam's assertion, that the ITC in another investigation (that of stainless steel plate) found a mixed pattern of under- and overselling coupled with rising import volumes "significant" for purposes of price effects is not binding on the ITC in a subsequent investigation, as the court noted throughout this opinion regarding the ITC's factual determinations.

the price premium the domestic product commands in the U.S. market. The existence of a price premium for domestic product was supported by testimony from both sides at the administrative hearing. As urged by the ITC, the court notes that the *Timken* decision stands for the proposition that the ITC may discount incidences of underselling on account of this price premium, where appropriate, as this premium mitigates underselling that is observed. *Timken*, 20 CIT at 87-88, 913 F. Supp. at 589-90.[28] Moreover, the court agrees with the ITC that the "significance" of price effects does not turn on a sole finding of more instances of underselling than overselling.

The statute also requires the Commission to determine whether "the effect of imports . . . otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." § 1677(7)(C)(ii)(II). The court finds that the ITC's finding with respect to this second component of price effects analysis is supported by the

---

[28] The *Timken* court stated:

> The Commission concluded that factoring in the price premium for domestic other special quality bars made the relatively small margins of underselling even less significant. [] Thus, the Commission appropriately examined whether there had been "significant price underselling" by the subject imports. *See* 19 U.S.C. § 1677(7)(C)(ii)(I). Evidence of underselling has been found to be less significant where there were price premiums for domestic products. *See Roses, Inc. v. United States*, 13 CIT 662, 665-66, 720 F. Supp. 180, 183 (1989) (62 out of 110 instances of underselling found insignificant because price premiums for locally-grown roses based on freshness and an ability to supply the flowers on a short-term need basis). *See also Trent Tube Div., Crucible Materials v. United States*, 14 CIT 386, 402, 741 F. Supp. 921, 935 (1990) (consistent underselling given less weight based on domestic price premium due to customer preferences and lead time differences, small volume of imports a consideration), *aff'd,* 975 F.2d 807 (Fed. Cir.1992). Thus, the Court cannot say that the Commission's conclusion was erroneous.

record. In addition to the elimination of the supply shortage, the ITC in the *Final Determination* found that the price decline at the end of the POI was a result of weak demand in this period and a rise of distributors' inventories. The record contains sufficient evidence to support this finding of the ITC, as well as its implications. In particular, the record indicates that demand for structural steel beams rose from 1999 to 2000 and flattened in 2001. Moreover, testimony and published articles cited in the *Final Determination* supported the observation that in the beginning of the POI, purchasers had a more rosy outlook on the condition of the economy and the market, which at the end proved to be unwarranted. The record contained evidence of a developing domestic supply shortage in the beginning of the POI and its subsequent resolution. Moreover, the court notes that, as explained earlier, the rise of subject import prices from 1999 to 2000 and their subsequent decline in 2001 cannot be ascribed to the similar trajectory of subject import volumes since the introduction of subject imports into the U.S. market would have led to a more immediate fall in prices due to ensuing competition.

Here, Fair Beam seems to be advancing a type of "price lag" theory arguing that, if subject imports had a delayed impact on prices, the later fall in prices could be attributable to the rise in volumes at the beginning of the POI. Fair Beam's reading of events taking place during this period and their interaction may have some plausibility if a lag in price effects could be properly assumed. However, under the substantial evidence standard, this court is charged to uphold the ITC's reasonable inferences from facts contained in the record. "It is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record." *Timken Co. v. United*

*States*, 12 CIT 955, 962, 699 F. Supp. 300, 306 (1988)*, aff'd*, 894 F.2d 385 (Fed. Cir. 1990) (citation omitted).  In other words, the court cannot give effect to alternative theories advanced by Plaintiffs or accord more weight to supporting facts highlighted by Plaintiffs, however plausible they may be, as long as the ITC's theory of events are also reasonable and supported by substantial evidence.

Moreover, the ITC did entertain Fair Beam's argument that subject imports may have had a delayed impact on prices and rejected the argument.  First, the ITC found that prices in the U.S. structural steel beam market are determined on the spot when offer and acceptance take place (even for the domestic producers).  *See Final Determination* at 26 n.100.  Second, the ITC rejected the "price lag" predictions of Fair Beam's econometric model reasoning that the model was flawed.  *See id.* at 29 n.107.

At the end of its price effects analysis, the ITC announced, "[w]e cannot conclude that the record indicates that either the inventory overhang or the resulting price declines were the function of the subject imports . . . .  We consequently conclude that the subject imports did not have significant price-depressing or -suppressing effects."  *Id.* at 29-30.  The ITC's decision was informed by its repeated observations in the *Final Determination* that the movements or activity in the U.S. structural steel beam market during the POI were explainable by factors wholly unrelated to subject imports with potentially unfair prices.  The ITC was correct in highlighting that a finding of "significant" price effects necessarily requires an accompanying finding of causal relationship between prices and subject imports.

**D. THE ITC'S DETERMINATION THAT SUBJECT IMPORTS HAD NO ADVERSE IMPACT IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW.**

*Parties' arguments*.

Fair Beam next charges that the ITC failed to consider that the domestic industry suffered large losses in sales and revenues. *See Pls.' Br.* at 21. Fair Beam argues that in the *Final Determination*, the ITC dismissed this evidence as "anecdotal," whereas in *Beams I* the ITC represented a similar condition as "further evidence of the negative effects of subject imports," which inconsistency is allegedly unsupportable under *Usinor*. *Id.* at 22.

The ITC argues that the *Final Determination* properly weighed the lost sales and revenues data. *See Def.'s Br.* at 22. The ITC argues that since the decline in domestic industry performance occurred from 2000 to 2001 when subject imports were declining, a link could not be established between subject imports and alleged lost sales and revenues. *See id.* In addition, the *Final Determination* found no adverse price effects. The combination of these two observations led the ITC to discount as "anecdotal" the lost sales and revenues data.

Salzgitter points out that "the performance of the domestic industry tracked the rise and fall of apparent U.S. consumption." *Salzgitter Br.* at 13. Thus, the decline in performance was not a function of imports. Salzgitter emphasizes that at the end of POI, the domestic industry actually gained market share (a "historic high"). *Id.* Salzgitter observes that the ITC construed this phenomenon as imports "filling shortages" and not "displacing domestic production."

*Impact analysis*.

Contrary to Fair Beam's assertion, the ITC's analysis involved a reasoned consideration of the lost sales and revenues data based on an extensive and detailed staff report. In a footnote

to the *Final Determination*, the ITC observed that because there was underselling of subject imports, it was "not surprising that there were some confirmed lost sales and revenues." *Final Determination* at 26 n.102. The domestic industry "submitted 27 lost sales and 173 lost revenue allegations," alleged lost sales totaling $[[  ]] million and alleged lost revenues totaling $[[ ]] million. *Staff Report* at V-18 & App. E. In the *Staff Report*, the ITC staff confirmed or "partially" confirmed 17 lost sales allegations of $24.1 million and 49 lost revenue allegations of $786,411. *Id.* at V-18 & V-19. The ITC staff added that a "large number of lost revenues allegations involve sales or quotations made after January 1, 2002" and that "[b]ecause of time constraints, and because purchasers don't always keep records of unsuccessful bids, some purchasers were unable to confirm or deny some specific allegations." *Id.* at V-19. In the *Final Determination*, considering the *Staff Report*, the ITC pronounced that "[b]ecause these allegations concern a period later than that for which the Commission collected pricing data, the record does not indicate whether they are indicative of overall pricing or underselling trends." *Final Determination* at 26 n.102. Moreover, the ITC stressed that the lost sales and revenue data was "anecdotal" and could not "outweigh the patterns" contained in "the pricing data overall." *Id.* The court finds the ITC's reasons to be sound and consistent with the underlying record.

Further, the ITC is not required to accord more weight to any factor of impact analysis at the expense of other factors. Specifically, "[n]o factor, standing alone, triggers a *per se* rule of material injury." *Am. Spring Wire Corp. v. United States*, 8 CIT 20, 23, 590 F. Supp. 1273, 1277 (1984) (citation omitted). Accordingly, the fact that the ITC decided to de-emphasize confirmed lost sales and revenues data does not detract from its finding of no impact because assigning different weights to different pieces of evidence is fully within the ITC's discretion.

The court finally notes that there is substantial evidence on the record in support of the ITC's finding that subject imports did not adversely impact the domestic industry. As required by the statute, the ITC in the *Final Determination* considered "all relevant economic factors . . . within the context of the business cycle and conditions of competition." § 1677(7)(C)(iii). In the *Final Determination*, the ITC noted that over the POI, the domestic industry actually gained market share, that the domestic industry's performance was improving as the subject import volumes were increasing, and that the later retardation in variables designed to measure the domestic industry's "health" could not be ascribed to subject imports. The court agrees that improvements in the output indicators (and other "health" factors) would likely not have been observed alongside increases in subject import volumes, had subject imports had an injurious present effect on the domestic industry. Further, as the ITC stated, the observed decline in output indicators at the end of the POI was likely not the result of the rise in subject imports on account of the intervening time between these two events. It may be that, as Salzgitter recommends, domestic output fell (as well subject import quantities) along with falling demand for structural steel beams in this period. For these reasons and given that the ITC found no "significant" volume and price effects in the POI, the court concludes that the ITC's no adverse impact finding is supported by the record and is otherwise in accordance with law.

**E. THE ITC'S DETERMINATION OF NO THREAT OF MATERIAL INJURY IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IS OTHERWISE IN ACCORDANCE WITH LAW.**

*Parties' arguments.*

In support of its argument that the ITC erred in finding no threat of material injury, Fair Beam first cites the testimony of a foreign executive who stated that U.S. prices were

"gorgeous," and that foreign producers are able to "react" quickly and are profit oriented. *Pls.'*
*Br.* at 23. According to Fair Beam, this is evidence of the opportunistic nature of foreign
producers who move quickly to take advantage of price differentials across markets. This part of
Fair Beam's argument stresses an inability to learn from past lessons. In particular, in *Beams I*
German and Spanish producers said they would not "opportunistically take advantage of short-
term opportunities" and were thereby excluded from that investigation. However, "[w]hat
happened next? . . . No sooner was the ink dry" on *Beams I*, then they returned and took
advantage of short-term opportunities. *Id.* at 24.

Fair Beam further points to current excess capacity of foreign producers. *See id.* at 25. In
*Beams I*, the ITC relied on a similar condition as part of its threat determination, whereas in the
*Final Determination*, the ITC focused on the existence of markets other than the U.S. where
foreign producers could sell their products. According to Fair Beam, the *Final Determination*'s
focus ignores a number of facts. *Id.* at 26-27. First, the foreigners demonstrated an ability to
quickly penetrate and shift their exports to the U.S. market during the POI. Second, foreign
producers projected an increase of exports to the U.S. in 2002 and 2003. Third, foreign capacity
is expected to increase in the future. Similarly, Fair Beam also criticizes the ITC's failure to
assign sufficient importance to increasing foreign inventories. *See id.* at 27. Because the ITC
found that some of the foreign inventories were not suitable for the U.S. market, Fair Beam
observes that "[s]ubject foreign producers can meet home market demand with such inventories,
while shifting production to ASTM products," which are U.S.-market-compatible. *Id.* at 28. Fair
Beam further points out that "the scope of the merchandise subject to investigation [was] nearly
identical in *Beams I* and *Beams II*. Therefore, assuming there is some merit to the contention

regarding different ASTM standards, it would equally be true for the inventories in both *Beams I* and *Beams II*." *Id.* Finally, Fair Beam contends that the ITC improperly disregarded evidence concerning the "vulnerability" of the domestic industry. *See id.* at 29.

The ITC counters that significant increases in imports were not imminent. *See Def.'s Br.* at 23. The ITC highlights a number of factors. First, the volume of imports was declining at the end of the POI. Second, the domestic capacity was increasing. Third, even though foreign producers projected an increase in imports in 2002 and 2003, the projections were still below 2000 levels (the high in volume). Fourth, foreign producers had other markets in which to sell their products. Five, the U.S. prices were traditionally higher (thus, the U.S. prices were not any more "attractive" than they had always been).

The ITC also argues that the *Final Determination* properly evaluated existing foreign capacity and potential to shift the goods to the United States. The ITC claims that these two factors are "insufficient to warrant an affirmative threat determination absent positive evidence showing that increased levels of importation are actually imminent." *Id.* at 26 (citing *inter alia BIC*, 21 CIT at 464, 964 F. Supp. at 405 ("Conjecture and speculation are not enough; there must be positive evidence tending to show an intention to increase levels of importation.") (quotation omitted)). The ITC posits that the *Final Determination* adequately explained why foreign producers had no incentive to increase imports to the United States. Among other matters, the *Final Determination* explained that not all steel beams of foreign production were suitable for U.S. consumption because they did not meet U.S. standards. *See id.* at 27.

The ITC next maintains that the *Final Determination* sufficiently considered the "vulnerability" of the U.S. industry. *See id.* at 29. The ITC emphasizes that the domestic

industry was about to expand capacity and "new and efficient" facilities were about to open. The ITC indicates that while "vulnerability" is a proper factor to consider in threat analysis, it is not a substitute for statutory criteria. *See id.* at 30 (citing *NEC Corp. v. Dep't of Commerce*, 23 CIT 987, 999, 83 F. Supp. 2d 1339, 1342-43 (1999)).

Stahlwerk argues that subject imports were declining at the end of the POI ("for six straight quarters") and, therefore, it was reasonable for the ITC to assume that such a trend would continue. *Stahlwerk Br.* at 25-26. With respect to U.S. prices being attractive for foreign producers to enter the market in the future, Stahlwerk stresses the price premium, implying that the U.S. prices will always be higher. *See id.* at 26. With respect to foreign unused capacity, Stahlwerk ponders why such capacity would not prevent subject imports from falling towards the end of POI. *See id.* at 27. With respect to the domestic industry's "vulnerability," Stahlwerk argues that the ITC did consider the industry's overall profitability with "new and efficient" mills in the works and that the ITC was not required to analyze the "unusually sensitive" nature of the industry to subject imports, once the ITC decided that the subject imports were not about to rise significantly. *See id.* at 28-29. Salzgitter adds that the ITC's negative threat determination followed logically from its negative material injury determination. *See Salzgitter* at 14.

***Threat Analysis***.

In a threat of material injury determination, the ITC must find whether "further dumped or subsidized imports are imminent and whether material injury by reason of imports would occur unless an order is issued." § 1677(7)(F)(ii). The pertinent factors outlined in the statute for a finding of threat of material injury are: (II) latent production capacity (or an imminent increase thereof) in the subject countries, taking into account alternative export markets; (III)

"significant" increase in volume or market penetration of subject imports indicating "likelihood of substantially increased imports;" (IV) likely "significant" suppression of price as to lead to an increase in future demand for imports; (V) inventories; (VI) ability of subject countries to shift production to subject merchandise; (VIII) "actual and potential negative effects" on the domestic industry's development; and (IX) "any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of" subject imports.[29] § 1677(7)(F)(i). The ITC must evaluate the statutory factors "as a whole" in making a threat determination. § 1677(7)(F)(ii). No such factor will "necessarily give decisive guidance with respect to the determination." *Id.* Moreover, the statute specifies that a threat determination cannot be based on a "mere conjecture or supposition." *Id.* Because section 1677(7)(F)(i) directs the ITC to consider all relevant economic factors in a threat investigation, the ITC has "no discretion in this matter." *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 984 (Fed. Cir. 1994); § 1677(7)(F)(i) (providing that the ITC "shall" consider all relevant economic factors).

The court agrees with the ITC and Defendant-Intervenors that there is substantial evidence in the record to support the *Final Determination*'s negative threat of material injury determination. A threat of material injury determination necessarily involves a prediction of the future. By warning that a "mere conjecture" is not enough to sustain an affirmative threat determination and by outlining non-discretionary factors to be evaluated, the statute aims to limit hypothesizing that naturally accompanies such a prediction. The Commissioner who dissented

---

[29] As stated by the ITC, the statutory factors (I) and (VII) are not relevant to this investigation and, therefore, not considered in this opinion. *See Final Determination* at 35 n.130.

from the negative threat determination of the ITC pointed out that the outlook of the U.S. structural steel beam industry at the end of the POI was somewhat mixed. *See Separate and Dissenting Views of Commissioner Lynn M. Bragg, Certain Structural Steel Beams from China, Germany, Italy, Luxembourg, Russia, South Africa, Spain, and Taiwan,* Invs. No. 731-TA-935-942 (July 2002) at 6 in *Administrative Record,* List 2, Doc. No. 171. The dissenting Commissioner especially noted among conditions adverse to the domestic industry's health: the substantial decline in the domestic industry's operating income, declining domestic capital stock and restricted access to capital, domestic start-up operations that are especially vulnerable to competitive forces, weak U.S. demand and increasing domestic inventories, increasing cost/price ratio indicating dampening profits, capacity increases in subject countries (especially in China), subject countries' allegedly demonstrated ease to shift production to U.S.-market-compatible product, domestic prices that persisted at higher levels than prices abroad, projected shipment increases by the subject countries, and projected capacity utilization increases in the subject countries. *See id.* at 6-8.

The court notes, however, that these arguably unfavorable facts regarding the existence of a threat were evaluated by the majority of the Commissioners and rejected. The ITC's duty in making a threat of material injury determination is to evaluate the non-discretionary statutory factors. The statute, *inter alia*, requires the ITC to conduct renewed analyses of subject import volumes and price effects regarding threat of material injury. In particular, the ITC shall examine whether there has been a "significant" increase in subject import volumes during the POI such that their continuing future presence in the U.S. market is "likely" and whether subject imports are "likely" to depress prices as to increase future demand for imports. *See* § 1677(7)(F)(i)(III) &

(IV). Accordingly, the ITC observed that at the end of the POI, both subject import volumes and prices were declining. In connection with its earlier finding that a domestic shortage was responsible for the rise in the subject import volumes, the ITC determined that "there was no likelihood of shortages in the imminent future" and, therefore, a similar rise in subject import volumes was not likely to occur in the future. *Final Determination* at 36. As urged by Fair Beam, the subject countries demonstrated an ability to shift shipment to the U.S. market with relative ease; however, given that the subject countries' shipments to the United States increased as a response to a temporary domestic shortage during the POI and subject imports left the U.S. market once the shortage was resolved, the ITC further predicted that a "significant" increase in subject imports was "unlikely."

Further, faced with declining prices at the end of the POI, the ITC could not but observe that imports were not likely to be spurred by favorable prices. Even though U.S. prices remained higher than prices elsewhere at the end of the POI, this was generally so and, therefore, this factor was not likely to encourage further imports in this specific period. In addition, as urged by the ITC counsel during oral argument, the pertinent comparison is not that the U.S. prices remained higher than prices abroad at the end of the POI, as expected, but that the U.S. prices were for the most part lower in 2001 than they had been in 2000.[30] *Oral Arg. Tr.* 34:5-21. Moreover, the ITC found no "significant" volume and price effects for the POI and asserted that there was no indication that these phenomena were likely to change in the imminent future.

With respect to subject countries' production capacity, the ITC noted that, even though an

---

[30] There is a suggestion in the record that an improvement in price at the very end of the POI took place as domestic producers responded to the onset of this investigation by increasing prices. *See Purchasers' Questionnaires* at 13 Question III-31 in *Pls.' App.* tab 11.

increase had been projected, there was no indication that such an increase would manifest itself as an imminent increase in subject import volumes. *Final Determination* at 37. As required by the statute, the ITC further indicated that subject countries had alternate markets at home or abroad to expend their capacity. With respect to subject countries' inventories, the ITC noted an increase during the POI, but also observed that not all structural beams inventories abroad were suitable for sale in the U.S. market by virtue of failing to satisfy the U.S. standard.[31] *Id.* at 38. With respect to the domestic industry's production capacity, the ITC pointed out that "new and efficient" facilities had already been completed or were about to be completed.[32] *Id.* at 38-39. All of these determinations concerning the statutory factors, provided for in section 1677(7)(F)(i)(II), (V) and (VI), were based on the detailed *Staff Report* and testimony presented at the administrative hearing.

Fair Beam also charges that the ITC did not consider the "vulnerability" of the domestic industry. The court notes, however, that the consideration of "vulnerability" of the domestic

---

[31] By merely mandating that the ITC consider "inventories of subject merchandise," § 1677(7)(F)(i)(V), the statute is not clear about whether the domestic industry's inventories are also to be considered. The ITC in the *Final Determination* nevertheless considered the level of domestic inventories during the POI and observed that although increasing "in absolute terms," domestic inventories declined "relative to imports and U.S. shipments of imports from 1999 to 2000." *Final Determination* at 38. "In 2001, these inventories declined from 2000 levels in absolute terms but were greater in relative terms than in either 1999 or 2000. However, the ratios of inventories to imports and to shipments of imports were at extremely low levels throughout the period of investigation." *Id.*

[32] Implicit in this observation is the consideration of the statutory factor (VIII). § 1677(7)(F)(i) (requiring consideration of "actual and potential negative effects" of imports on the domestic industry's development).

industry is not specifically provided for in the statute as part of the required analysis.[33]  While it

is proper for the ITC to consider "vulnerability" among "relevant economic factors," §

1677(7)(F)(i), it cannot be the sole basis of an affirmative threat determination in the presence of

other statutory criteria that have not been fulfilled.  *See NEC*, 23 CIT at 999, 83 F. Supp. 2d at

1342-43.[34]  Moreover, the ITC in the *Final Determination* did consider the "vulnerability" of the

domestic industry in indicating that despite varying performances of individual players, the

domestic industry remained "profitable overall."  *Final Determination* at 39.  The views of the

---

[33] The "vulnerability" language appears in the legislative history of the Uruguay Round Agreements Act.  *See* SAA at 885 ("In material injury determinations, the Commission considers, in addition to imports, other factors that may be contributing to overall injury.  While these factors, in some cases, may account for the injury to the domestic industry, they also may demonstrate that an industry is facing difficulties from a variety of sources and is vulnerable to dumped or subsidized imports.").

[34] The *NEC* court stated:

> In a threat determination, "vulnerability analysis" is appropriate and relevant to consider as "among other relevant economic factors." [] 19 U.S.C. § 1677(7)(F)(i) (1994). Underlying vulnerability analysis is the principle that the foreign industry must "take the domestic industry as [it] finds it." *Hosiden Corp. v. Advanced Display Mfrs. of Am.,* 85 F.3d 1561, 1569 (Fed.Cir.1996) (quoting *Iwatsu Elec. Co. v. United States,* 15 CIT 44, 57, 758 F.Supp. 1506, 1518 (1991)). In *Goss Graphics,* the Court endorsed the use of "vulnerability analysis," so long as "the Commission did not substitute its finding of vulnerability for consideration of the statutory criteria." *Goss Graphics* [*v. United States*, 22 CIT 983, 1004, 33 F. Supp. 2d 1082, 1101 (1998)]. Accordingly, an affirmative threat determination based solely on a finding of vulnerability coupled with the presence of statutory factors would be the kind of temporal connection disapproved of in *Gerald Metals*[, 132 F.3d at 716.] Yet the "by reason of" standard is met if the Commission can articulate a causal connection between the threat of injury to the domestic industry and the subject imports themselves, while avoiding attributing the threat from non-import factors to threat from subject imports. *See Goss Graphics,* []33 F.Supp.2d at 1103 (affirming the Commission's conclusion that, "[t]he vulnerability of the industry in combination with the adverse trends of increased subject imports and the small number of pending sales created the threat of material injury.").

dissenting Commissioner bring to the attention of the court a number of arguably unfavorable conditions surrounding the domestic industry in this period, especially towards the end of the POI, making it vulnerable to dumped imports. A decline in domestic industry's sales revenues and operating income in the 2000-2001 period was also acknowledged by the ITC panel in its impact determination. *Final Determination* at 33. There, the ITC determined that the declining trends were not due to subject imports, but at least in part ascribable to a decline in demand. As the statute requires a causal link between a threat of material injury finding and subject imports, § 1673d(b)(1), and as the record establishes a number of favorable conditions pertaining to the domestic industry, the court cannot say that the majority of the Commissioners' treatment of the domestic industry's adverse trends was unreasonable and factually unsupportable.


## IV. CONCLUSION

In light of the foregoing, the court sustains the ITC's negative material injury and negative threat of material injury determinations in *Certain Structural Steel Beams from China, Germany, Luxembourg, Russia, South Africa, Spain and Taiwan*, Invs. Nos. 731-TA-935-936 and 938-942 (Final), USITC Pub. No. 3522 (June 2002). Accordingly, the court denies Plaintiffs' Motion for a Judgment upon an Agency Record. Judgment will be entered accordingly.


Dated: _____                    _____
             New York, New York                                        Judith M. Barzilay
                                                                                   Judge

**ERRATUM**

*Committee for Fair Beam Imports v. United States*, Ct. No. 02-00531, Slip Op. 03-73, Dated June 27, 2003.

Page 3, footnote 3:

Footnote 3 on page 3 should read:

Initially, Italy was also investigated.  However, upon a finding of no dumping by Commerce, the ITC discontinued its investigation of Italian structural beams.  The court further notes that no cumulation issues are raised in this appeal.

July 22, 2003